UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STOUT ROAD ASSOCIATES, INC. t/a HILTON PHILADELPHIA CITY AVENUE<br><br>Plaintiff,<br><br>v.<br><br>DEFENSE SUPPLY CENTER RICHMOND a/k/a DLA (Defense Logistics Agency) RICHMOND<br><br>Defendant. | : | No. 07-145C<br>(Judge Wheeler) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stout Road Associates, Inc. t/a Hilton Philadelphia City Avenue ("Hilton"), by its undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Defendant Defense Supply Center Richmond a/k/a DLA Richmond's ("DLA Richmond") Motion for Summary Judgment and in support of Hilton's Cross-Motion for Summary Judgment.

## I. Preliminary Statement

Very often, a party's actions belies its legal position in a case. This case involves that kind of situation. As detailed in the factual section below, supported by the undisputed record in this case, Defendant DLA Richmond was one of the training sites under the auspices of the Defense Logistics Agency, the DLA Training Center in Columbus, Ohio whereby government interns in various career programs were situated for their training. Training occurred in various locations, both on the military bases on which the interns were placed, and at remote locations

where interns were brought together for joint training. Where joint training sessions occurred, the record shows that **trainee interns were responsible for making their own hotel and travel reservations. They had authority to make the reservations and had authority to subject the government to the terms and conditions of such reservations.** There was no government contracting officer with specific responsibility for reviewing these reservations or making travel plans for the interns. Indeed, while there were supposed to be training sessions to inform the interns on how to make these reservations, at the time the subject reservation was made, there had not yet been any such instruction.

Accordingly, when one trainee, Donna Rutkowski ("Rutkowski") was instructed by her direct superior Lilibeth DeLos Santos ("Santos") to make a block reservation for the interns at DLA Richmond for a conference to be held in Philadelphia, Rutkowski reasonably believed that she had authority to make that reservation and signed a contract on behalf of DLA Richmond - - committing it to a block of 180 room nights over three weekends. Indeed, this was not the first time that Rutkowski had been asked to make a block reservation, as she had done so previously for another conference in nearby Valley Forge, Pennsylvania. Other block reservations were made for DLA trainees, as well. The record will also show that while the head of the training program voiced her <u>opinion</u> that block reservations were not preferred, there was no such policy against them and block reservations routinely were made.

The difference in this case between other prior block reservations, is that Rutkowski, because she made reservations for blocks of rooms over a period of time (three weeks), was asked to sign a written contract providing for a cancellation penalty if cancellation was not made within a certain time prior to the date of the conference. When the conference at the Hilton was cancelled shortly before the scheduled date, the contract clearly provided for the payment of a

$18,000.00 penalty. When Hilton contacted DLA Richmond concerning the penalty, DLA Richmond did not even question the authority of Rutkowski to make the reservation. Rather, DLA Richmond only questioned whether Hilton had mitigated its damages in this matter. Indeed, DLA Richmond's attorney asked for Hilton's vacancy rates so as to allow it to compute what it believes should be the damages. See, Complaint, Exhibit "C".[1] Only months later, after Hilton pointed out that a liquidated damage clause is enforceable on its face did the claim "morph" into one of lack of authority on the part of Rutkowski to make the reservation. That "change of heart" is telling. Lack of authority is generally the foremost defense raised by the government in cases where such a defense is available. In this case, not only was the defense not raised initially, but when Hilton was forced to file a claim with the contracting officer pursuant to 41 U.S.C. §605 (Complaint, Exhibit "D"), that claim was simply ignored. No investigation was undertaken by the contracting officer and no response to the claim was filed. Rather, Defendant arrogantly refused to even consider the claim - - thus forcing Hilton to file this action after 30 days and incur the attorneys' fees of commencing an action and traveling to Washington, DC to take discovery.

Fortunately, this particular contract provides for the payment of attorneys' fees should Hilton be required to enforce its rights under the agreement. DLA Richmond has absolutely no basis by which to deny this claim. After depositions ordered by this Court, it is indisputable that the interns at each of the DLA training centers had actual authority to make reservations for themselves. No further specific grant of authority need be proven. Total responsibility was placed in each group of interns to make reservations for themselves when they were required to travel. When making reservations, DLA Richmond agreed to the terms and conditions of the

[1] The Complaint is attached hereto as Exhibit "A".

reservation policy of the respective hotel in which reservations were made. Thus, while Rutkowski - - **at the specific request of her supervisor** - - made a block reservation at the Hilton, that reservation was made subject to the terms and conditions of the written contract attached to the Complaint as Exhibit "A".

Alternatively, it is equally obvious that the doctrine of implied actual authority is directly implicated in this case. By placing the responsibility of making reservations for remote training sessions on each respective group of DLA interns, it necessarily was part of their duties and authority to make reservations such as the one made with Hilton. The fact that DLA Richmond is unhappy with the contract signed by Rutkowski on behalf of DLA Richmond does not in any way detract from this doctrine. Indeed, the fact that Ms. Rutkowski was instructed to make several blocks of reservations before there even had been a training session with respect to the internal policies concerning travel reflects the inherent authority placed in each of trainees to enter into contracts such as the one in question here.

Finally, to the extent that such an analysis is necessary, it is also clear that Ms. Rutkowski's actions were ratified. Ms. Rutkowski **specifically** asked DLA training **at its highest level** of her authority to make reservations for her group. She informed the head of DLA training that she intended to make a block reservation as well. While she was informed that "I would **recommend** you make individual reservations," **nothing was said about policy or limitations on authority.** Certainly, a "recommendation" cannot transform itself into policy, much less a lack of authority on behalf of Rutkowski. The record therefore also demonstrates ratification of the actions taken by Rutkowski.

Under any of these theories, it is clear that not only should DLA Richmond's motion for summary judgment be denied as there is not an iota of evidence supporting the claims made in

DLA Richmond's Summary Judgment Motion, but it is also apparent that Hilton is entitled to summary judgment in its favor.

## II. Statement of Facts

The record in this case consists of the pleadings (Exhibits "A") and of four depositions. Those depositions were of Donna Rutkowski ("Exhibit "B"), her direct superior Lilibeth DeLos Santos (Exhibit "C"), the head of the DLA Training Center Pamela Latker (presented as a designee) (Exhibit "D"), and Gian Bianchini (presented as a designee on a limited basis (Exhibit "E"). The relevant factual findings from those depositions are as follows:

1. Donna Rutkowski is a Quality Assurance Specialist Intern for DLA Richmond, having served in that position since January 2006 subsequent to spending twenty years in the military. Dep. Rutkowski at p. 8.

2. At the time Rutkowski made the reservation at Hilton Rutkowski believed that she was authorized to make block reservations for her training group and also to cancel them. Dep. Rutkowski at pp. 23-24.

3. Prior to the reservation at the Hilton, Rutkowski had been asked to make and did make block reservations at the Homewood Suites in Philadelphia (later corrected to Hilton Valley Forge) for a class to be held in May 2006 for one week. That class was cancelled, she called the hotel and cancelled the reservation. Dep. Rutkowski at p. 23.

4. Ms. Rutkowski was asked by her superior, DeLos Santos to make reservations for her group at a conference in Philadelphia scheduled for July 10 and 21st of 2006. Dep. Rutkowski at pp. 39-40.

5. Upon receiving that request, which she understood to be rooms for fifteen individuals in the same hotel, she inquired of the senior individuals at the DLA Training Center

concerning what she was to do. Dep. Rutkowski at pp. 40-43 and Exhibit Rutkowski 7. Neither of the top two individuals at DLA Richmond Center told Rutkowski that she should not be making reservations for the group. Dep. Rutkowski at p. 43 and Exhibit R7.

6. Indeed, Rutkowski had made a prior block reservation at the Valley Forge Hilton (a different hotel) without questions as to her authority. Dep. Rutkowski at p. 42.

7. Based on the responses to her specific questions, Rutkowski signed the contract that is the subject of this litigation. Dep. Rutkowski at p. 43 and Exhibit R8.

8. Rutkowski specifically represented in the contract that she was authorized to sign and enter into the contract. Dep. Rutkowski at p. 44 and Exhibit R8.

9. Rutkowski looked over the contract before she signed it and knew that the contract had provisions both for cancellation penalties and for indemnification from any causes of action, including attorneys' fees, arising from a claim. Dep. Rutkowski at pp. 44-45.

10. Rutkowski informed her supervisors that reservations were made and believed that she had the authorization to sign the contract on behalf of DLA Richmond. Dep. Rutkowski at pp. 45-46.

11. Rutkowski had received specific authorization for this trip from her second level supervisor, Roland R. Herpel, as she did for the prior Valley Forge trip. Dep. Rutkowski at pp. 46-48 and an authorization number was provided for this travel. Dep. Rutkowski at p. 48 and Exhibit R9.

12. The trip to Philadelphia for statistically quality control training was moved from Philadelphia to Richmond and postponed until the Fall of 2006 and accordingly, the Philadelphia meeting was cancelled. Dep. Rutkowski at pp. 53-54.

13. Rutkowski then cancelled the Hilton reservations and, when informed that there was a cancellation fee, consulted with her superior, Herpel, and was instructed to have no further contact with the Hilton. Dep. Rutkowski at pp. 55-57 and Exhibit R13.

14. Rutkowski has received consistently excellent reviews and was not disciplined for alleging violating DLA Policy. Dep. Rutkowski at pp. 9-14.

15. Pamela Latker ("Latker") is the Career Programs Branch Chief for the DLA Training Center. Dep. Latker at p. 5. She was presented as a designee and was familiar with the meeting for which the Hilton reservations were made. Dep. Latker at p. 6.

16. The meeting was to be a statistical quality control training class and Richmond interns were scheduled to go to Philadelphia because Philadelphia interns also were attending that meeting. Dep. Latker at p. 11.

17. At the time of this meeting, the Richmond interns had not received any formal guidance yet on making reservations for remote travel. Had they received such guidance, they would have been intruded that they should make their own reservations. Dep. Latker at p. 11. They had received nothing in writing nor any of form of guidance prior to the time of this meeting. Id.

18. There is no written policy which specifically deals with the necessity of making individual reservations for hotels by the interns. Dep. Latker at p. 16.

19. Indeed, any policies of the government apply only to the use of credit cards, not to the making of reservations. As acknowledged by Latker:

> You can make a reservation for a group, but you can't reserve it with your own government credit card other than your own room.

Dep. Latker at p. 17.

20. Latker was informed by Rutkowski of her intention to make a block reservation and of her entering into such a reservation. Dep. Latker at pp. 18-19.

21. The DLA Travel Policy is that when reservations are made, "the government subjects itself to the cancellation policies of the hotel." Dep. Latker at p. 21; Dep. Bianchini at p. 15. ("Q: That is standard for the government, it will pay late cancellation fees if required by the hotel's policy? A: Yes it is.").

22. While Latker continually attempted to assert that there was no authorization to sign a written contract, she was unaware of any DLA policy with respect to the signing of an agreement and indeed acknowledged there is no such written policy. Dep. Latker at pp. 21-22.

23. Latker acknowledged that she was unaware of any specific training as of the time Rutkowski made the reservation concerning travel arrangements and also acknowledged that it was apparent that both Rutkowski and her supervisor DeLos Santos believed that there was no limitation on the authority to make and cancel reservations. Dep. Latker at pp. 22-24.

24. Thus, Ms. Latker admitted as follows:

> Q: So to get back to my question that started this, is there any written policy that states while these people are authorized to make hotel reservations for the group for DTC functions they are not to sign anything?
>
> A: No that I'm aware of. But, again, **we don't recommend group reservations.**

Dep. Latker at p. 25.

25. Latker is not aware of any written directives or e-mails within DLA with respect to the signing of a written contract for a reservation block. Dep. Latker at pp. 26-27.

26. Crucially, Latker admitted that with respect to the training sessions, "it is their [the interns] responsibility to make their own individual travel arrangements." Dep. Latker at pp. 32-33.

27. In addition to the two acknowledged block reservations made at the Valley Forge Hilton and the Hilton City Avenue, Latker knew of another occasion in which block reservations were made for a conference in 2006 in Ohio. Dep. Latker at p. 35.

28. Latker also admitted that there is no individual contracting officer who has the responsibility of authorizing contracts with a conference facility or hotel within DLA. Dep. Latker at p. 37.

29. Latker further admitted that there is a "understanding . . . that they (the interns) are going to make their own hotel reservations." Latker continued:

> They [the interns] are authorized (to make reservations and cancel them) when we send out the reporting instructions.

Dep. Latker at p. 45.

30. Rutkowski's immediate supervisor, DeLos Santos, while being extremely evasive[2] did admit that she instructed Rutkowski to make a block reservation both for the Valley Forge Hilton Conference and the City Line Hilton Conference and both had to be cancelled. Dep. DeLos Santos at pp. 25-27. As DeLos Santos admitted (after approximately an hour of going in circles):

> Q: Isn't the real problem, the only issue here, not that she was making a reservation, because she did it on a couple of occasions, but that she made a reservation at a hotel that had a cancellation fee?
>
> A: I guess, yes.

[2] The Court can decide this for itself, from the transcript of DeLos Santos' deposition. (Exhibit "C" hereto).

> Q: Had the City Avenue Hotel not had a cancellation fee and she would have cancelled the reservation, there would have been no issue, correct, just would have been a cancelled reservation and you would have gone on, correct?
>
> A: Whether both or not, the same, yes.
>
> Q: Had the meeting gone forward, you would have expected the reservations to have been held, correct?
>
> A: **Yes.**

Dep. DeLos Santos at p. 45.

31. Based on this record, it is obvious that each training group had authority to make its own reservations and that it could subject itself to the cancellation policies of the hotels at which it made reservations. While individual reservations were preferred, there was no prohibition or policy concerning block reservations or written contracts. As noted in the preliminary statement, above, the original response of the government, i.e., that the issue was mitigation, not authority, is telling. Under any theory of authority (actual, implied actual authority, or ratification), the instant contract is enforceable. Accordingly, summary judgment should be granted in favor of Hilton and against DLA Richmond.

## III. Hilton Is Entitled To Summary Judgment Enforcing The Terms Of The Contract

### A. Rutkowski Had Actual Authority to Bind DLA Richmond

As detailed above, it is clear that authority for making reservations was specifically placed in the hands of each intern group to exercise as they see fit. There were no restrictions on reservations, cancellation fees, there was no contracting officer responsible for those tasks, and there were no departmental prohibitions which were violated in the execution of the Hilton contract. Not only did Rutkowski and her direct supervisor believe and understand they had

authority to make and cancel reservations, the specific reservation at issue was reviewed by the highest levels or authority in DLA. They (Latker and her immediate subordinate) were told that Rutkowski intended to make a block reservation at the Hilton and, while they informed her that its preferable to make individual reservations, she **never** was informed that it was a violation of policy or that she should not do so. Indeed, the record is replete with examples of block reservations at DLA in the 2006 calendar year. (The Philadelphia, Valley Forge and Ohio Conferences).

Since the record is undisputed that there were no government contracting officer responsible for intern travel and that the interns were responsible for their own travel arrangements, actual authority lay with Rutkowski to make the reservation that is at issue. Under longstanding law, a Plaintiff seeking to enforce a contract with the government on an express contract must demonstrate (1) mutuality of intent to contract, (2) lack of ambiguity and offer an acceptance, (3) consideration, and (4) actual authority of the government representative whose conduct is relied upon to bind the government in contract. International Data Products Corp. v. U.S., 70 Fed. CL. 387, 400(Fed. Cl. 2006). There is no dispute that Rutkowski signed the contract which is the subject of this action. The only question relates to her authority. The record clearly demonstrates that DLA had authority to conduct its training program (indeed, the government admits this) and there was no contracting officer responsible for any specific aspect of travel within DLA. Rather, this fell within the day to day activities of DLA and it was admitted by each of the government witnesses that the interns had authority to make and cancel reservations. The only issue raised is whether Donna Rutkowski had authority to sign a written contract. With all due respect to the government, that is a distinction without a difference. Either she has contracting authority or she does not. Since it is undisputed that Donna

Rutkowski had actual authority to make and cancel reservations, and there is no policy or prohibition limiting that authority to individual (as opposed to block) reservations, she had actual authority to make this reservation as a matter of law. As candidly acknowledged by each of the witnesses, had the situation been reversed, they would have expected Hilton to honor their reservation. The government cannot have it both ways. They cannot leave the making of reservations as a matter of policy to their interns and then deny their authority, especially where the "line of demarcation" according to the government's argument between authorized reservations and unauthorized ones is whether a contract is in writing - - something without any support on the record. DLA was authorized, both statutorily, and in a regulatory sense to conduct its operations and procure goods and services. This is admitted by the government. The attempt to limit that authorization on the basis of an unwritten "preference" for individual unwritten contracts is intangible as a matter of law.

**B. Rutkowski had implied actual authority to make the reservations**

Whether or not the government has an arguable position that Rutkowski did not have actual authority to make the reservations, it is clear beyond a shadow of a doubt that she did have what is known as "implied actual authority". Implied actual authority, which is express authority circumstantially proved, may be found through evidence as to the manner in which an entity has operated in the past, the facts attending the transaction in question, the circumstantial evidence surrounding the given transaction and/or the habitual usage or course of dealing common to the entity. Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 127-28 (3rd Cir. 1998). Implied actual authority is derived from the doctrine that an agent is vested with the implied authority to do all of those things necessary or incidental to the agency assignment. First Interstate Bank of Texas, N.A. v. First National Bank of Jefferson, 928 F.2d 153, 157 (5th Cir. 1991).

In the context of a contract with the United States, authority "is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee." H. Landau & Company v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989). Where it is an agent's responsibility to perform certain tasks and he has "day-to-day responsibility regarding performance of the contract," implied actual authority should be found. California Sand & Gravel, Inc. v. United States, 22 CL. Ct. 19, 27 (Cl. Ct. 1990), citing Landau. Here, not only is there a complete unanimity of opinion among the government employees that the making of reservations and travel arrangements for the interns was left to the interns as part of their day-to-day responsibility, it is supported by **all of the documentary evidence.** Each witness testified that it is up to the interns to make their own reservations. Each of the witnesses testified that there was authority to make reservations and subject the government to the reservation and cancellation policy of the individual hotel. Rutkowski had made block reservations previously and indeed, there was evidence presented that another conference in Ohio similarly was made pursuant to a block reservation. There were no written policy or limitations on the authority reservations and, when Rutkowski specifically inquired to the head of the DLA Training Program of her immediate superiors request to make a block reservation, it was not told that it was a violation of policy to do so or that she should not do so. No training or other information (such as written policies) were presented to the interns to give then information as to any limitations on their authority to conduct the acts of making travel arrangements. Accordingly the evidence overwhelmingly demonstrates that there was implied actual authority of Rutkowski to sign the contract subjecting the government to liability in this case. The attempt to limit her authority to make reservations to unwritten individual reservations not only is unsupported by the record (that is not a **single** writing detailing such a limitation) but it is not even supported by

the director of the DLA Program, who merely testified that it is a mere preference to make individual reservations and there is no such formal policy. Indeed, she did not object to the making of block reservations when it was brought to her attention prior to the execution of the Hilton contract. As Ms. Latker acknowledged that was an essential part of the training program for interns to meet in remote locations for certain training sessions and that the authority to make the reservations had been left in the hands of the interns, the implied actual authority mandates that summary judgment be entered in favor of Hilton.

**C. In Any Event, Ms. Latker Ratified The Contract.**

It cannot be overly stressed that the specific intentions of Rutkowski were communicated to her superiors at the highest level. Then, after making the reservation, Rutkowski communicated to her superior that she had made a block reservation for her group. Even after the reservation was cancelled and Hilton made the claim, there was no assertion of lack of authority but rather, only a suggestion (contrary to law) that Hilton should have mitigated its damage. Under Federal contracting law, "ratification occurs when the principal, upon learning of an unauthorized act of its agent, acquiesces in or affirms that act through his conduct." H&V Cent. Riverfront Corp. v. United States, 32 Fed. Cl. 547, 550 (1995). "For effective ratification, a superior must have authority to ratify, [and must have] knowledge of a subordinate's unauthorized act . . ." California Sand & Gravel, Inc. v. United States, supra, 22 Cl. Ct. at 27. Knowledge of the facts is the essential element of ratification and must be shown or such facts proved that its existence is a necessary inference from them. United States v. Beebe, 180 U.S. 343, 354 (1901), citing in Dan Rice Construction Company v. United States, 36 Fed. Cl. 1, 3-4 (Fed. Cl. 1996).

The string of email correspondence within DLA Richmond is fatal to any denial that the making of the reservation was ratified. As noted above, it was acknowledged by one of the government designees that reservations may be made subject to the cancellation policies imposed by the respective hotel. In this case, Rutkowski indicated her intention to make a block reservation to the director of the DLA program as well as her two immediate supervisors. She was not dissuaded from doing so. Subsequently, she communicated to her direct supervisor that she had made the reservation. As noted above, she either was authorized to make the reservation subject to the terms and conditions of that reservation or she was not authorized. The position taken by the government is that she may have had authorization to make reservations, but not to commit the government to cancellation fees. This kind of distinction cannot be made. Rutkowski either had authority or she did not have authority. As the record is clear not only that she had authority, but that when in possession of all material facts, the director of DLA acquiesced in the making of such reservations, the ratification doctrine is yet another basis by which summary judgment should be granted to Hilton.

## IV. Conclusion

As detailed above, this case involves a defense which never should have been asserted. The government has scrambled for a position which has been a moving target. It is indisputable that the individual training groups of DLA had actual authority to handle their own travel arrangements. They were asked to do so by the director of DLA and they were given no limitations on their authority, whether it be to cancellation policies or written contracts. Under this state of facts, it is simply disingenuous for the government to assert that Rutkowski lacked authority to enter in the contract that is the subject of this action. Hilton is entitled to summary

judgment in its favor in the amount of $18,000.00 plus interest from the date of the contract, together with attorneys' fees per the terms of the contract.

Respectfully submitted,

WILENTZ GOLDMAN & SPITZER, P.A.

Date: 11/28/07

BY: ____________________

JONATHAN J. BART, ESQUIRE
Counsel for Plaintiff

Two Penn Center Plaza
Suite 910
Philadelphia, PA 19102
(215) 569-0000