# EXHIBIT "B"

UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

STOUT ROAD :
ASSOCIATES, INC. t/a :
HILTON PHILADELPHIA :
CITY AVENUE :
v. :
DEFENSE SUPPLY CENTER:
RICHMOND a/k/a DLA :
(Defense Logistics : NO. 07-145C
Agency) RICHMOND : (Judge Wheeler)

ORIGINAL

\- - -

Friday, October 12, 2007

\- - -

Oral deposition of DONNA RUTKOWSKI, taken pursuant to notice, was held at the offices of UNITED STATES DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION BRANCH, CIVIL DIVISION, 1100 L Street NW, 12th Floor, Washington, DC, commencing at 10:20 a.m., on the above date, before Beth A. Barkocy, Certified Court Reporter and Notary Public.

\- - -

MAGNA LEGAL SERVICES
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 910
Philadelphia, PA 19102

APPEARANCES:

WILENTZ, GOLDMAN, AND SPITZER
BY: JONATHAN BART, ESQUIRE
Two Penn Center
Suite 910
Philadelphia, Pennsylvania 19102
(215) 925-1105
Representing the Plaintiff

UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
CIVIL DIVISION
BY: CARRIE DUNSMORE, ESQUIRE
1100 L Street NW
12th Floor
Washington, DC 20005
(202) 305-7576
Representing the Defendant

DEFENSE SUPPLY CENTER RICHMOND
DSCR-G
BY: DONALD M. YENOVKIAN, II, ESQUIRE
8000 Jefferson Davis Highway
Richmond, Virginia 23297
(804) 279-5538
Representing the Defendant

\- - -

I N D E X

\- - -

Testimony of: DONNA RUTKOWSKI

By Mr. Bart.............. 7, 79

By Ms. Dunsmore............. 77

\- - -

E X H I B I T S

\- - -



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| R-1 | GOV-251 through GOV-256 | 9 |
| R-2 | GOV-234 | 13 |
| R-3 | GOV-241 | 13 |
| R-4 | GOV-249 | 13 |
| R-5 | GOV-58 | 25 |
| R-6 | GOV-45 | 27 |
| R-7 | GOV-1 through GOV-7 | 38 |
| R-8 | Hilton Letter of Agreement | 43 |
| R-9 | GOV-40 | 46 |

- - -

EXHIBITS (Cont'd)

- - -


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| R-10 | GOV-574 | 53 |
| R-11 | GOV-10 through GOV-11 | 58 |
| R-12 | GOV-34 | 62 |
| R-13 | GOV-12 through GOV-13 | 62 |
| R-14 | Declaration of Donna M. Rutkowski | 70 |

\- - -

DEPOSITION SUPPORT INDEX

\- - -

Direction to Witness Not to Answer

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Request for Production of Documents

| Page | Line | Page | Line |
|---|---|---|---|
| 36 | 2 | 48 | 7 |

Stipulations

| Page | Line | Page | Line |
|---|---|---|---|
| 6 | 1 | | |

Questions Marked

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

(It is hereby stipulated and agreed by and among counsel for the respective parties that the sealing, certification, and filing are waived and that all objections, except as to the form of the question, be reserved until the time of trial.)

- - -

DONNA RUTKOWSKI, having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

MS. DUNSMORE: Let's just stipulate again that the previous stipulations will apply for this deposition.

MR. BART: Is there any of these that you don't want?

MS. DUNSMORE: No.

MR. BART: I thought we had agreed.

MS. DUNSMORE: I know, but I

just like to dot the Is and cross
the Ts, so the same stipulations as
referred to in the previous
deposition of Gian Bianchini apply
to this deposition. Thank you.
BY MR. BART:
Q. Ms. Rutkowski, my name is
Jonathan Bart; I'm with Wilentz, Goldman,
and Spitzer, the attorneys for Stout Road
Associates, doing business as the Hilton
Philadelphia City Avenue.
Have you ever had your
deposition taken before?
A. No.
Q. I'm going to ask you a number
of questions as to which you have to give
a verbal response. Do you understand?
A. Yes, sir.
Q. A nod of the head or an
uh-huh won't do. If you understand the
question, I'll expect that you answer it
fully and completely. If there is
anything you don't understand, feel free
to ask me to clarify it. Do you

understand that?

A. Yes, sir.

Q. If at any time you need to consult with your counsel, just let me know. If you need to take a break, just let me know. Do you understand?

A. Yes, sir.

Q. By whom are you currently employed, Ms. Rutkowski?

A. I'm currently employed at Defense Supply Center Richmond under DTC, defense training center, corporate intern program.

Q. What is your title?

A. Quality assurance specialist intern.

Q. How long have you been a quality assurance specialist intern?

A. Since January 2006.

Q. What was your position prior to that time?

A. Prior to that was mental health for a couple years. Prior to that, 20 years military.

Q. Did you retire from the military?

A. Yes.

Q. What rank did you retire with?

A. E-6, US Army.

MR. BART: Let me mark as Exhibit R-1 a series of documents which have been provided by your counsel.

(Exhibit R-1 was marked for identification.)

BY MR. BART:

Q. I'd like to show you this and, one, ask you if you recognize them, and if you do, what each document is, state what each document is (indicating).

A. (No response.)

Q. Do you recognize these documents?

A. Yes, sir.

Q. Why don't you go one by one and state what each one is.

A. The first document, which is

level one certification quality assurance, I got prior military service, May 22, 2000.

Q. That's the one that was marked GOV-251.

A. For that requirement, the next two documents were two years of experience, quality experience, got me the level one certification, so the next document --

Q. Those two are -- the certificates are 252 and 253?

A. They are the ones associated with the main document.

The next one is a quality assurance certificate, which I received in the petroleum commodity from the defense supply energy center which I was employed while in the military.

Q. That's 254.

A. Acquisition course was here at Fort Lee, Virginia, which I received during my intern working towards level two certification.

Q. That's 255.

A. Technical functions and overview pertains to my job training certificate for when I first went to Columbus after my -- for initial orientation and what the function of my job entailed, which is the technical function overview course.

Q. That's 256.

Ms. Rutkowski, these documents would seem to indicate that you've worked in the quality assurance area since at least 2000; is that correct?

A. Correct.

Q. Why don't you describe, generally, your understanding for a layperson such as myself of what is done in the area of quality assurance.

A. Quality assurance can be broken down to several different areas. While I was in the military and working for the defense energy support center, I worked in the petroleum commodity,

analyzed petroleum products, verified fuel deliveries and so forth overseas for five and a half years. Since I've come on board, I switched commodities.

Q. Come on board, meaning with --

A. The Defense Supply Center here at Richmond. Aspect of quality assurance now is slightly different. I'm working with products associated with aviation now, not as a petroleum product, so it's now -- my job is to analyze, review drawings, specifications pertaining to the product that we're purchasing for whatever military unit that we're supplying to.

Q. What type of documents do you review in the normal course of your job?

A. A lot of specifications, drawings, anything that's associated with the building of an item that we're purchasing.

Q. Do you compare the specifications with the contracts calling

for purchase of these items?

A. Not specifically. That's dealt with in another section. My job is just to analyze the part itself. All the monetaries are dealt with in another area.

Q. How do you find out what the specifications are so that you know you're comparing the product to what it's supposed to be?

A. Military service has their own specification for each product they want.

Q. I'm going to show you two sets of documents which we'll mark as Exhibits Rutkowski -- three sets, two, three, and four.

(Exhibits R-2, R-3, and R-4 were marked for identification.)

BY MR. BART:

Q. I'll hand these to you, but hold on a second and I'll ask a couple questions first (indicating).

Ms. Rutkowski, do you have an

understanding of the basis of the lawsuit that we're here for this deposition today?

A. Yes, sir.

Q. What is your understanding of what the lawsuit is about?

A. My understanding of the lawsuit is about my misinterpretation of binding the government when I didn't have the authority to do so.

Q. How did you arrive at that understanding of the lawsuit; is that your read of it or is that based on discussions with counsel?

A. It was based on my understanding with counsel and everything else when things rose to that level.

Q. Have you ever been subject to any form of discipline or any sort of written disapproval of your actions relating to the reservation of rooms at the Hilton City Avenue?

A. No, sir.

Q. I'd like you to take a look

at the three documents that we marked as Exhibits-2, 3, and 4, and tell me whether you've seen these before.

A. Yes, sir.

Q. These are, as they say, intern quality progress reports for you in October '06, January '07, and April -- I'm sorry, June '07?

A. That is correct, sir.

Q. It's fair to say that all of these progress reports are solidly favorable, correct?

A. Yes, sir.

Q. At no point either before or afterwards has there been any suggestion that your work was unsatisfactory as a result of the events which are the subject of this lawsuit, correct?

A. Yes, sir.

Q. When you say that you misinterpreted -- that there was a misinterpretation, what are you referring to specifically; what did you believe you misinterpreted?

A. My understanding was I was just making room reservations for 15 -- myself and 14 other interns for our training seminar down there at Defense Supply Center Philadelphia for a two-week course.

Q. What is it that you misinterpreted?

A. I didn't realize until later that I was only reserving rooms for it but not binding anything because of the canceled rooms in the past with no problem.

Q. Your misinterpretation was you didn't understand there was a cancellation provision in the contract you signed?

A. Yes, sir.

Q. You believed at the time you made the reservations that you were authorized to make room reservations for the intern group, correct?

A. Yes, sir.

Q. Do you still believe you are

authorized to make reservations for intern groups?

A. No, sir.

Q. When did you learn that you were not authorized to make such reservations?

A. Back in June when I canceled the things and I spoke to my second line supervision, Mr. Rowland Herpel, that there was an issue at that time.

Q. Was his issue the fact that the contract had a cancellation provision or was it the fact that you were making reservations at all?

A. I don't recall, sir.

Q. Do you recall him saying at any point that you shouldn't be signing contracts like that, meaning with a cancellation provision?

A. No, sir.

Q. What do you recall him saying specifically? I think you said it was in June of 2006.

A. Sir, my best recollection of

it when I spoke with Mr. Herpel, he explained to me I didn't have the authority to be signing anything for anybody other than myself. That's the first time I was aware of that situation. I don't remember his exact wording, but he went over and explained different procedures. I can't remember exactly how it went, but the bottom line was I was not authorized to sign for anybody. The only one that had authority for that was the contracting officer. He went into what a contracting officer person's job was and what they dealt with.

Q. Until that discussion in June, did you know what a contracting officer was?

A. Not really, sir.

Q. Did he tell you who the contracting officer was who was responsible for this type of contract?

A. No, sir.

Q. Do you know sitting here today who the contracting officer is with

responsibility for making room reservations?

A. No, sir.

Q. You mentioned Mr. Herpel. Let's step back for a second and go through the chain of authority.

You're in the intern program, correct?

A. Yes, sir.

Q. You're in quality assurance, correct?

A. Yes, sir.

Q. Other than interns, to whom do the interns in quality assurance in Richmond immediately report to?

A. They immediately report to their floor supervisor, as you see the different names on here, the different floor supervisors (indicating).

Q. Who is your floor supervisor?

A. At this time and date, I have Mr. David Weiner.

Q. In 2006, it was somebody different?

A. That is correct, sir.
Q. Who was it at that time?
A. Depends on what part of 2006, sir.
Q. I think we're talking about April of 2006.
A. That would have been Lilibeth de los Santos.
Q. What was her title? You said floor supervisor. Was that her title?
A. No, sir.
Q. What was her title?
A. Her title was functional supervisor for the interns.
Q. To whom did Ms. de los Santos report; who was her immediate supervisor?
A. Mr. Rowland Herpel.
Q. What was his title?
A. Not exactly sure, sir.
Q. Was Mr. Herpel the top line supervisor for the interns in Richmond?
A. Not completely, sir. He was the middle man for here. We answered to Columbus, to defense training center.

Q. I said in Richmond. I was going to get to Columbus in a second. He had the senior authority in Richmond for the interns in quality assurance?

A. (No response.)

Q. Was there anyone he answered to or reported to in Richmond?

A. He has a boss, sir, but the intern program falls up under the guidelines of -- it's kind of hard to explain. The corporate intern program has their own set and Richmond only relays information because Columbus has authority over us.

Q. Is it fair to say, then, Mr. Herpel had various areas of responsibility, one of which was the intern program, and for that area of responsibility, he answered to the people in Ohio?

A. Yes, sir.

Q. He had other responsibilities for which he would answer to a superior in Richmond?

A. That is correct, sir.

Q. I understand. We're staying right now just with the intern program. Do you know to whom he answered in Ohio; who was his immediate supervisor for intern matters?

A. For April 2006, it was Napoleon Walker.

Q. I think we heard before Mr. Walker then reported ultimately to Pam Latker?

A. Yes, sir.

Q. Pam Latker was the head of the program?

A. Of all the intern program.

Q. Had you ever prior to April of 2006 been in a training session with Ms. Latker or Mr. Walker?

A. Yes, sir.

Q. Did they explain to you the procedures for attending training sessions?

A. We met with those individuals in March of '06 up at Columbus

orientation. They just gave us a brief overview, really no specifics, just saying maintain your personal appearance and class and just general information of them, not too specific.

Q. Let's step back for a second. You testified a short while ago that before the events involving the Hilton City Avenue in Philadelphia, you had canceled reservations before without any problem. What examples can you give me of having made reservations and canceled them without a problem prior to this instance?

A. Prior to this instance with intern center, made rooms with the Homewood Suites in Philadelphia for the same group for training session that was going to be held in May for one week. Class got canceled, called the hotel and cancelled the reservation straight out.

Q. At that point, you believed that you were authorized to make those reservations, correct?

A. Yes, sir.

Q. And similarly authorized to cancel them, correct?

A. Yes, sir.

Q. You didn't just go off and decide to make the reservations on your own, did you; someone had asked you to do that, correct?

A. Yes, sir.

Q. Who was that person?

A. Lilibeth de los Santos.

Q. Is that correct for both the ones at the Homewood Suites earlier and the ones at the Hilton City Avenue?

A. Yes, sir.

Q. Were there any other occasions in which you had canceled reservations without a problem?

A. Only other times, sir, was prior military. Different locations overseas, I've made reservations and canceled them for small groups.

Q. When she asked you to make -- let's start with the one at the Homewood

Suites.

In this regard, let me mark the next exhibit (indicating).

(Exhibit R-5 was marked for identification.)

BY MR. BART:

Q. This is a document that's been produced to us. This says student's schedule. First of all, is this reflecting your schedule during the period from March 2006 through September 2006?

A. Yes, sir.

Q. Is that your handwriting?

A. Yes, sir.

Q. Do you know -- just going through the various written notations, there is an indication where you said reschedule for two dates, 5/15 to 5/17, 5/18 to 5/19 in Philadelphia; do you see that?

A. Yes, sir.

Q. Are those the rooms you were referring to that you canceled?