# EXHIBIT "B"

Cont'd

A. Yes, sir, that was the first reservation.

Q. Were these two sets of reservations the same or perhaps the second one was at the Valley Forge Hilton? Do you recall making a reservation at the Valley Forge Hilton as well?

A. The one for the Hilton should have been the first one.

Q. You said Homewood Suites as well.

A. Isn't it one and the same? I think it's called Homewood Suites, isn't it?

Q. I wouldn't know. That's why I'm asking you. I'm noticing, though, the schedule reflects two separate meetings, one for specifications and standards, 5/15 to 17, and then training, 5/18 to 19, and there are different rooms involved.

A. Same time span but just two different locations on DSCP Philadelphia.

MR. BART: Let me mark this as six (indicating).

(Exhibit R-6 was marked for identification.)

BY MR. BART:

Q. This is an e-mail that you sent to Ms. de los Santos on April 28, 2006 where you state that you've made a block 15-room reservation with your credit card to the Valley Forge Hilton. Does this reflect that you made a reservation at the Valley Forge Hilton?

A. Yes, sir.

Q. Was there an additional reservation at the Homewood Suites or does this refresh your memory that the reservation was one and the same?

A. One and the same, sir.

Q. Nobody told you at this point that you shouldn't be making block reservations, did they?

A. No, sir.

Q. Do you know who would have received copies of the information that

these reservations had been made?
A. I just forwarded it to my supervisor.
Q. Do you know what she did with them?
A. No, sir.
Q. Who ultimately schedules all these meetings that we're looking at in what we've marked as R-5?
A. Comes down from the training center from Columbus.
Q. That would be Mr. Walker and Ms. Latker?
A. Yes, sir.
Q. Would you have expected that the notice that you provided or the information concerning the room reservations be transmitted to them?
A. No, sir.
Q. Does that mean you don't know or that you would expect that Ms. de los Santos would not have told them that you had made reservations for the interns?

A. I can't assume what she would or would not do, sir.
Q. You don't know, correct?
A. That's correct.
Q. This particular reservation for the Valley Forge Hilton which we see was rescheduled. You then went and canceled, correct?
A. Yes, sir.
Q. In that particular case, did you sign any document or did you just make a block reservation with a credit card over the phone?
A. Block reservation over the phone with my government credit card and faxed the names of all 15 individuals that were going there.
Q. You faxed it to the Valley Forge Hilton, correct?
A. Yes.
Q. Did you fax it to anyone else?
A. No, sir.
Q. Let me just rephrase the

question slightly.

On that fax that you sent to the Valley Forge Hilton, did you copy it to anybody?

A. No, sir.

Q. Not even Ms. de los Santos?

A. No, sir.

Q. Explain how the government credit card you used works. What does it say on the card itself?

A. My personal government card that I got says Business Card by Bank of America, my name, and the number on it.

Q. Does it say anything on it with Department of Defense or any other statement that it is a government card?

A. No, sir.

Q. Do you get the monthly bills for that card?

A. Yes, sir.

Q. How do you apply for that card?

A. The card is applied through the organization.

Q. Did you fill out forms in order to get it?

A. Yes, sir. Mine was reactivated; the same number I had while I was in the military was reactivated when I came on federal service.

Q. Going back to your student schedule, which is R-5, what is the writing at the bottom; what does it say, LMS --

A. Learning management system. That is a system where all the courses are electronically kept, you get your certificates. At that time it was Mr. Walker. I crossed off his name and then I put Kim Morgan's name as supervisor. You had to go through your supervisor to get your various certificates if you didn't get them at the class or they were delayed. They were kept in that system.

Q. Did the change from Mr. Walker to Ms. Morgan have to do with her replacing him in that position at a

certain point or were you just mistaken that he was your supervisor for that?
A. No, sir. Mr. Walker was our supervisor when we came on board and he got lateral transferred into another area and Ms. Morgan took over that position.
Q. This was sometime during the period in which the schedule covered?
A. Yes, sir.
Q. When you started out, you had Mr. Walker there, and then when you learned of the change, you crossed that out and put Ms. Morgan?
A. That is correct, sir.
Q. This schedule reflects the same schedule for you and all of the interns in your program; did everybody have the same schedule?
A. Yes, sir.
Q. How many interns were there?
A. Richmond had 15, Columbus had five, Philly had ten.
Q. Did you all have the same schedule, so in other words, all 30

interns from three locations went to all of these courses that are on the schedule?

A. Not all, sir.

Q. What would determine whether some people went and some didn't?

A. Some of the interns from Columbus stayed right there because that's where the instructors are at and some things they did locally instead of all the TDY costs, the money involved. A lot of times it was more Philly, Richmond, traveling between the two areas.

Q. For each of -- just looking at them, it says room number for the first one, drawings, dimensions, and tolerancing, and four days in Richmond, Virginia, and it says at the Homewood. Did you have a hotel room for that particular meeting?

A. We had a room that was reserved by DTC from Columbus that they taught in one of the conference rooms in

the hotel.

Q. Did you stay in the hotel or did you --

A. That's local travel, sir.

Q. You stayed at your home?

A. That's correct.

Q. What about the third one? I assume the same was true for the second one in Richmond as well?

A. Yes, sir.

Q. The third one was Columbus, Ohio for four days at the end of March. Where did you stay for that one?

A. The hotel down there in Columbus.

Q. Who made the reservation there?

A. That was our orientation briefing, and reservation was made by defense DT -- is it okay if I just keep abbreviating?

Q. That's fine.

A. At DTC they sent us down a thing. At that time, it was all interns,

all commodities that went, and Columbus coordinated. It was not only quality assurance interns, it was also supply, contracting, IT, and several others from Philadelphia, Richmond, the folks from D list from Battle Creek, Michigan, and a few of the various staff folks were interns. They set up the reservations at the various hotels for the various locations and they just sent us things stating you are staying at this hotel, check in with your ID card and your military -- your government credit card.

Q. Do you know who at Columbus made that reservation?

A. No, sir. Mr. Walker just sent us a list stating that we were all staying at -- the group of us were staying at this hotel from this time until then.

MR. BART: Counsel, do you know if that reservation was provided in the documents?

MS. DUNSMORE: I'm not

certain.

MR. BART: To the extent it has not, I would ask that it be produced. I don't recall it being in there.

MS. DUNSMORE: Okay.

MR. BART: This is the reservation for the Columbus, Ohio meeting, March 27, 2006 through March 31, 2006, reflected on R-5.

BY MR. BART:

Q. The next one on your list is another meeting in Columbus approximately four days later. Did you continue to stay there or did you go back and forth?

A. No, we stayed right there at Columbus.

Q. That was part of the same reservation?

A. Yes, sir.

Q. Do you remember what hotel it was? It says Jade 801, Ruby, and Opal, which sounds to me like the meeting rooms as opposed to the hotel itself.

A. That was the meeting room located at Defense Supply Center Columbus. It was on their installation.
Q. Do you recall the name of the hotel you stayed at?
A. It was the Homewood Suites.
Q. You stayed there for approximately two weeks?
A. Yes, sir.
Q. When you stay at these hotels, do you get your own room or share a room?
A. Our own room, sir.
Q. The next one on the schedule are the ones that you reserved and then canceled at the Valley Forge Hilton, correct?
A. Yes, sir.
Q. Then the next one after that is in Richmond, basic statistics. That also was a -- you stayed at home?
A. Yes, sir.
Q. The final one, statistical quality control, is the one that was at

the Hilton City Avenue, correct?

A. Yes, sir.

MR. BART: R-7 (indicating).

(Exhibit R-7 was marked for identification.)

BY MR. BART:

Q. I've marked as R-7 a series of e-mails from April 24th to May 8th which were produced, apparently, from Mr. Herpel's computer. Can you just review this document and tell me whether you recognize this string of e-mails since I believe you are either the sender or the recipient of each of them.

MR. BART: Just for the record, these documents are Bates stamped GOV-1 through GOV-7.

THE WITNESS: Okay, sir.

BY MR. BART:

Q. Do you recall either sending or receiving all of these e-mails?

A. Yes, sir.

Q. Actually, the string appears to start on April 17th.

MS. DUNSMORE: It looks like GOV-8 is part of GOV-7, part of the same document (indicating). I think the same information is repeated within this packet, but I just want to clarify.

MR. BART: It's fine. That's probably why I didn't copy it, because it's already in there. That's the problem with doing, as a general matter in depositions, e-mail strings, because each one picks up the ones before them and it gets confusing.

BY MR. BART:

Q. I think you testified that Ms. Santos asked you to make a reservation for the conference in Philadelphia scheduled for July 10th and 21st, correct, of 2006?

A. Yes, sir.

Q. How did she ask you to do that?

A. Sir, I recall something to

the fact, Donna, go make reservations for 15 for Philadelphia. I can't remember the exact wording, but I got the task to do it.

Q. If you take a look at what's marked as GOV-2, the second page, you are writing on April 24th to Mr. Walker that Lilibeth wanted me to make a block reservation for the Philadelphia trip; do you see that?

A. Yes, sir.

Q. That's what she had asked you to do?

A. Yes, sir.

Q. What did you understand a block reservation to be?

A. Rooms for 15 individuals.

Q. In the same hotel?

A. Yes.

Q. Hopefully, somewhere reasonably close to each other, or didn't that matter?

A. Be in the same hotel because we were going up in government vehicles

for the same training session.

Q. It says in your e-mail to Mr. Walker that you do not have any authorization code to give a hotel. What did you mean by that?

A. When I spoke to the hotel, they wanted an authorization code. That's why I turned around and asked him for it.

Q. Did he give you one?

A. No.

Q. What did he tell you?

A. That's when I wrote another e-mail, which is right above it, going and finding out --

Q. I think the reply says you got an out-of-office reply from him?

A. Yes.

Q. Then you went and asked Ms. Latker?

A. I basically forwarded her the same e-mail, forwarded her or copied it, one of the two. I can't figure out how this thing looks. Yeah, forwarded it

(indicating).

Q. She recommended you make individual reservations, correct?

A. Yes. That's what I did with the hotel, provided all 15 names for the hotel.

Q. She didn't tell you you couldn't make a block reservation, did she?

A. No, sir.

Q. You had made a block reservation at the Valley Forge Hilton, had you not?

A. Yes, sir.

Q. You believed that you could, correct?

A. Yes, sir.

Q. Did you get back to the City Avenue Hilton on the issue of authorization? You said they wanted an authorization code.

A. She sent me -- I got the paperwork faxed to me by Jaret Lyons to fill out and send back, sent me the forms

to fill out and send back to him.

Q. You did get an authorization number to put on the forms, correct?

A. He just told me to fill out these forms and send them back to him.

Q. What did the forms contain; did the forms contain any sort of authorization?

A. I don't recall, sir.

Q. Neither Mr. Walker nor Ms. Latker told you you shouldn't be making reservations for the group, did they?

A. Correct, sir.

MR. BART: Let's mark this as the next exhibit (indicating).

(Exhibit R-8 was marked for identification.)

BY MR. BART:

Q. Then is it correct that you received and signed this letter of agreement between Hilton Philadelphia City Avenue and DLA Richmond on the 25th?

A. Yes, sir.

Q. That is your signature on the last page?

A. Yes, sir.

Q. Right above that, you wrote that you -- it says the undersigned represent that they are authorized to sign and enter into this contract, correct?

A. Yes, sir.

Q. Did you read this contract before you signed it?

A. I don't recall, sir. I remember looking it over, but I'm not sure I read it verbatim; I can't be sure.

Q. You did read it?

A. I did look it over.

Q. The agreement, on Page 2, had a cancellation clause, correct?

A. Yes, sir.

Q. That clause states that cancellation of this agreement less than one year prior to the contracted event dates, the group will be assessed 80 percent of the anticipated gross

revenue derived from the sleeping rooms, correct?

A. Yes, sir.

Q. It further has a provision on Page 3 that the hotel and the group agree to indemnify each other from any causes of action, including attorneys' fees, arising from a claim; do you see that?

A. Yes, sir.

Q. You looked this over before you signed it, correct?

A. Yes, sir.

Q. Upon signing this agreement, did you send it to anybody?

A. No, sir.

Q. What did you do with it?

A. I kept it on a file on my desk and informed my supervisors the reservations were made and I faxed information back to the hotel.

Q. What did you fax back to the hotel?

A. They had me fax back my credit card number to them, which is on

another form. It's not on this one, I don't see (indicating).

Q. Was there any authorization code on that subsequent fax?

A. No, sir.

MR. BART: Let's mark the next exhibit (indicating).

(Exhibit R-9 was marked for identification.)

BY MR. BART:

Q. In any event, at the time you signed that contract you believed you had the authorization to sign it on behalf of DLA Richmond, correct?

A. I thought I was just making room reservations. I filled out forms like this before.

Q. You believed you were allowed to do it, correct?

A. Yes, sir.

Q. I'm going to show you what has been marked as Exhibit-9 (indicating). It's an e-mail from Defense Travel System to you that your

authorization for a Philadelphia number was stamped canceled by Rowland R. Herpel, Jr.. Do you know what this referred to?

A. Yes, sir. We have a document -- I can't think of the correct form number, but it's on a form authorizing travel. It would be on our travel orders. 1556, I believe the form is; I'm not sure. They always have a number assigned to your travel order authorizing you to travel to one location to the next, stating how many days, mode of travel.

Q. Do you know what the authorization was that this e-mail refers to and why it was canceled by Mr. Herpel?

A. He is the one who signs off on our orders to go on travel, so once the trip got canceled, he has to submit the paperwork to cancel. It's standard procedure.

Q. Given the date of this cancellation, did this refer to the one

at Valley Forge?
A. Yes, sir.
Q. Was there a similar authorization number for the travel at the Hilton City Avenue?
A. More than likely, sir.
MR. BART: I, again, did not see any documents in the production which would have referred to the authorization for the Philadelphia City Avenue trip and would request production of any such documents.
BY MR. BART:
Q. Explain how this authorization for the Valley Forge trip came to be. What did you do that got you this authorization number (indicating)?
A. Sir, I can't really explain. This is something that comes from way above my realm. It's a number that's assigned from a county office for your trip.
Q. Did you get this for any trip that you made a reservation for?

A. Only once your orders are cut by your supervisor and once it's been approved through all the various levels. It goes through several levels besides at Richmond. It goes to Columbus before it's approved for the trip even though Richmond may approve it. Unless Columbus approves it, that's when you get your authorization number and the funds are available through that organization. They have their own set of numbers up there.

Q. I'm going to show you what we marked previously as Exhibits Bianchini-2 and 3 and ask you if you've ever seen a form like that before (indicating).

A. No, sir.

Q. Did you know that it was the policy of DLA Richmond or DSC Richmond to pay cancellation fees when the hotel policy provides for it?

A. No, sir.

Q. When you made the reservation for the Valley Forge Hilton, that was a

block reservation, correct?

A. Yes, sir.

Q. You put in for an authorization code for the anticipated cost of those reservations?

A. No, sir.

Q. Then what was the authorization code referring to?

A. Our own individual travel. Each one of us has a different number on our travel orders. That never was assigned for funds for me to go on that trip.

Q. Because it was canceled, correct?

A. Yes, sir.

Q. The policy is that the funds are only made available when the trip actually happens, correct?

A. Yes, sir.

Q. If it gets canceled, they cut off the funding, correct?

A. Yes, sir.

Q. If the trip to the City

Avenue Hilton had occurred, the funds would have been made available to pay for it, correct?

A. Yes, sir. Funds would have been made available for each individual for that trip.

Q. Had the reservation not been kept by the City Avenue Hilton, what would the government have done?

A. I don't know, sir.

Q. They would have expected that the rooms were to be held, correct?

A. (No response.)

Q. When you made a reservation, you generally expect that the hotel is going to hold that reservation for you, correct?

A. Yes, sir.

Q. Looking back at R-7, which is the string of e-mails, take a look at GOV-5. That's the e-mail from Mr. Lyons to you attaching the contract, correct?

A. Yes, sir.

Q. Do you know when you

forwarded this to Mr. Herpel?

A. I don't recall forwarding this to Mr. Herpel.

Q. It is his e-mail string, correct, at the top of the page?

A. That would have been forwarded after the cancellation, sir. I don't remember doing it prior.

Q. You didn't call and ask him any questions, did you, Mr. Lyons, as the last sentence of the e-mail says, feel free to call with any questions?

A. No, sir.

Q. On the last page of this e-mail string is a discussion between you, Mr. Herpel, Mr. Walker, Ms. Latker, Ms. de los Santos, and Ms. France regarding a trip to Philadelphia and recommending that the class be postponed. Did that refer to the one in Valley Forge or --

A. This was Valley Forge, sir.

Q. They were all involved in the planning of that particular meeting,

correct?

A. Yes, sir, because the instructor got sick on that thing and they were just trying to reschedule it. That was the problem for the first class.

Q. There was a similar problem with the class for which you reserved the City Avenue rooms, too, correct?

A. The reason was not given for the second class. I don't know why it was canceled, sir.

MR. BART: Let's mark this e-mail as R-10 (indicating).

(Exhibit R-10 was marked for identification.)

BY MR. BART:

Q. What we've marked as R-10 is an e-mail from Ms. de los Santos to a number of people, including yourself, Mr. Walker, Mr. Herpel, pretty much the entire group, saying that the statistical quality control has been moved from Philadelphia to Richmond. Does that refresh your memory as to why the

Philadelphia meeting was canceled?

A. It doesn't state why it was canceled, sir. They decided to move it and we didn't get it until the fall of the year sometime further. That's why it got canceled in Philly.

Q. They moved the meeting out of Philadelphia. Whatever the reason they decided to move it, they did move it and it wasn't going to be held in Philadelphia, correct?

A. Yes, sir.

Q. Mr. Walker was sent copies from Ms. de los Santos of the course roster, correct?

A. I see his name on there, yes, sir.

Q. Do you know whether Ms. de los Santos had sent information regarding the reservations to Mr. Walker as well?

A. No, sir.

Q. You don't know one way or the other?

A. That's correct, sir.
Q. Did you ever speak to Ms. de los Santos about it?
A. I informed her I made the room reservations, sir.
Q. After it was canceled and the City Avenue Hilton said there is a cancellation fee due -- you recall that happening, correct?
A. Yes, sir.
Q. What did you do next?
A. I went down and seen Mr. Herpel because Lilibeth was in training that week.
Q. What did you tell him?
A. I brought everything with me. I called him first and he told me to come down to his office with everything I had.
Q. Did you have a discussion?
A. He told me he was going to contact Lyons, for me not to contact him, he was going to contact and talk with him, and just wait.
Q. Do you know if they had a

conversation; did you speak to Mr. Herpel after that?

A. Yes, sir. He told me not to worry about it right now, he is taking care of it and he has also contacted legal for me, just make no further contact with the Hilton.

Q. Did he tell you anything else?

A. No, sir.

Q. He didn't tell you about the discussion he had with Mr. Lyons?

A. That is correct, sir.

Q. Did you ever have any conversations with Mr. Walker about this matter?

A. No, sir. At that time, it switched over to Kim Morgan in June.

Q. Did you have any conversations with Ms. Morgan?

A. No, sir.

Q. How about Pam Latker?

A. No, sir.

Q. Have you ever had any

conversations with Ms. Latker?
A. Only just meeting her back there in March of '06.
Q. Is the same true for Mr. Walker and then Ms. Morgan?
A. Ms. Morgan, I have met a couple different times because she's come down to Richmond, bringing us new schedules and giving us updates.
Q. Did you ever discuss this matter with her?
A. No, sir, because Mr. Herpel explained to me to leave it between him and the lawyers and don't discuss the case.
Q. Your last discussion concerning this case was when you went down and spoke with Mr. Herpel and then subsequently he told you he was dealing with it?
A. Yes, sir. Then my only conversation was with the lawyers from that point on.
MR. BART: Next exhibit

(indicating).

(Exhibit R-11 was marked for identification.)

BY MR. BART:

Q. I'm showing you an e-mail string between yourself and Mr. Lyons on June 14th and 15th. If you look at the second page, on June 14th, first thing in the morning, you told him that they needed -- the reservations at the Hilton City Avenue needed to be canceled, correct?

A. Yes, sir.

Q. He responded with the follow-up on the second page reminding you of the termination, the cancellation provision, correct?

A. Yes, sir.

Q. You wrote back to him, and I assume when you wrote missed interpret, you meant misinterpreted, correct?

A. Yes, sir.

Q. What is it that you misinterpreted in that agreement?

A. I was under the assumption of just making room reservations, not realizing anything else. Once I talked to Mr. Herpel, he advised me to send a letter explaining.

Q. This is the letter you sent after speaking to Mr. Herpel?

A. Yes, sir.

Q. I don't recall you talking about that aspect of your conversation with Mr. Herpel. Why don't you tell me what he said you should do in writing to Mr. Lyons, and was it at that morning meeting you were talking about?

A. It was at the morning meeting. He just -- I can't recall exactly but something to the fact that explain that you're an intern, you were making room reservations -- I'm trying to stop and think. It's over a year ago.

Q. Take your time.

A. Main thing is he just asked me to explain to the individual that I was just making room reservations instead