# EXHIBIT "B"

Cont'd

of everybody making their own personal rooms.

Q. Did Mr. Herpel -- was he in the chain of telling you what -- to make the reservations?

A. We've seen him previously for a list of hotels and everything else to make reservations at.

Q. He never told you at that point that you were not authorized to make room reservations for the group, did he?

A. No, sir.

Q. That only happened after all of this went down, correct?

A. That's correct, sir.

MS. DUNSMORE: Do you need a break?

THE WITNESS: I'm good.

MR. BART: I'm fine.

MS. DUNSMORE: I just wanted to make sure she's okay.

BY MR. BART:

Q. Do you ever recall being told

-- let me ask it this way: Do you recall at any point being told of any procedure to utilize in making room reservations?

A. No, sir.

Q. Have you been told anything with regard to the procedure for making room reservations subsequent to this?

A. Yes, sir.

Q. What were you told?

A. I was told basically each individual makes their own room reservations, and if it's set up from an organization, it has to be done by a contracting officer.

Q. Who told you this and when?

A. Mr. Herpel, in one of our meetings with this going on, within a day or two, explaining everything.

Q. As far as you were concerned, was this a new procedure?

A. Yes, sir.

Q. No one previously had said that you shouldn't be making block reservations, correct?

A. That's right, sir.
Q. In fact, you had made previous ones, correct?
A. Yes, sir.
MR. BART: Let's go through the chronology (indicating).
(Exhibit R-12 was marked for identification.)
BY MR. BART:
Q. Is R-12 the e-mail you sent to him pretty early in the morning on the 15th; you sent it to Mr. Herpel with a copy to Ms. de los Santos, basically asking what to do?
A. Uh-huh.
Q. After you got Mr. Lyon's e-mail reminding you of the cancellation provision, correct?
A. Yes, sir.
MR. BART: This is 13 (indicating).
(Exhibit R-13 was marked for identification.)
BY MR. BART:

Q. Is this Mr. Herpel's response, which is he's in business reviews most of the day, do not call Mr. Lyons, he spoke to him Thursday afternoon and will get back to me sometime today?

A. That's correct.

Q. That's the following day, correct?

A. Yes, sir.

Q. That's after you sent the letter telling him that you had misinterpreted the contract?

A. Yes, sir.

Q. There was nothing in the contract itself you misinterpreted, was there; you just misinterpreted what your authority was?

A. I misinterpreted it by not reading it carefully, which is hindsight now.

Q. You didn't necessarily -- there's nothing in the agreement that you thought was difficult to understand, it's

just that you believed you made a mistake in signing it, correct?

A. Yes, sir.

Q. Did Mr. Herpel tell you subsequently you shouldn't be signing contracts like that?

A. After it.

Q. After what?

A. After these correspondence went down when he talked to me in his office and explained things.

Q. About how much later was it?

A. After cancellation already took place, sometime within these couple days right here (indicating).

Q. He had never told you that beforehand, had he?

A. Correct, sir.

Q. No one else had either, correct?

A. No, sir.

Q. No one told you Ms. de los Santos shouldn't be asking you to make room reservations for other

people?

A. That's correct, sir.

Q. Since that time, do you ever make reservations for other people?

A. No, sir.

Q. Who makes the reservations? I assume these kinds of meetings continue to go on, correct?

A. Yes, sir.

Q. Who makes the reservations for the hotel rooms at these meetings?

A. We individually do, sir.

Q. For each of them; you never have anybody making reservations for the entire group?

A. No, sir.

Q. Was there ever a document that came down telling people what they should do subsequent to this event?

A. Not that I recall, sir.

Q. It was just oral?

A. Yes, sir.

Q. How did it get presented?

A. Just...

Q. Was there a meeting?

A. It was more or less just a small group discussion between the cubes. We used to have morning meetings in the intern center. Now we're all split up. Back during that time, we had a row of cubes, two rows of cubes, so one day --

Q. By cubes, do you mean cubicles?

A. Yes. One day the meeting might be a cube on the right side, next day on the left side. Everybody just came there and got a general meeting.

Since that time, the first part of July, in the middle depending on when you got placed, what you seen in the previous things with the different supervisor, we got placed on the floor into the different organizations at DSCR. We're all separated now, not together anymore.

Q. While you were there, you had one of these meetings in the cubes and someone explained that --

A. Yes.

Q. -- you should all be careful to make sure you make your own reservations?

A. Yes, sir.

Q. Who was the one who told you that; who was the one who gave that advice?

A. Through Rick, through Lilibeth. She said it came down from Rick that from this point out, to make our own reservations, something similar to that.

Q. The person who said it was Ms. Santos?

A. Yes, sir.

Q. She said it was coming down through Mr. Herpel?

A. That's correct.

Q. Did she say whether it was coming down from Columbus?

A. No.

Q. You would assume that, wouldn't you?

A. I'm not going to make that assumption, sir.

Q. Fair enough.

When you get your quarterly reviews that we looked at earlier, is there a meeting that you have to discuss it?

A. The main discussion goes down with your floor supervisor. What you got was just the evaluation. Previous to that would have been a few other -- they would have spelled out the technical jobs you were doing, how many you did of those technical jobs and so forth, which would have had a different rating scheme. What you seen was just the written part of the evaluation.

Q. At the end of the quarter in which this happened, did you also get a review, meaning I think it would have been 6/30 of '06? The reason I'm asking is because the one I got in the documents was blank, so I'm trying to figure out what happened with that review.

A. That one, we're still in the intern center, and somehow we signed them, gave them to Lilibeth, and what happened from that point I cannot answer, sir.

Q. You didn't get one with the written doing a great job that particular quarter?

A. No, sir.

Q. You didn't get one that said you were doing a terrible job either; you didn't get one, correct?

A. That's correct, sir.

Q. Did you have a meeting that quarter, though, to discuss your performance?

A. No, sir.

Q. Did you ever have a meeting in which your performance was discussed and the issue of this reservation and the dispute over the fee came up?

A. No, sir.

MR. BART: The next exhibit, please (indicating.)

(Exhibit R-14 was marked for identification.)

BY MR. BART:

Q. I'm showing you R-14. Is that your signature on the second page of this declaration?

A. Yes, sir.

Q. You didn't draft this declaration, did you?

A. No, sir.

Q. Was this given to you when you were asked to sign it?

A. It was after speaking with the attorney that was working the case at the time, Mr. Rogers.

Q. Don't tell me what you told Mr. Rogers, but at the time of the events that we're speaking of, which is in April through June of 2006, you did not know one way or -- you believed you had authority to enter into the contract, correct?

A. Yes, sir.

Q. Where it says, No. 3, as a QA

specialist intern, I have no authority to enter into contracts on behalf of the government, that's something that was told to you by counsel, correct?

MS. DUNSMORE: Objection.

MR. BART: It's been disclosed. The fact she is saying it in a declaration is --

BY MR. BART:

Q. Let me ask: Where did that information come from? I'll ask it generally.

MR. BART: If it's disclosed to a third party, obviously, it's waived as to that. I'm not claiming a complete waiver, but if she got this from counsel, I'm entitled to know what it is because it's being submitted to the Court.

MS. DUNSMORE: She said she spoke with counsel. She said she didn't draft it but she said she spoke with him about it.

BY MR. BART:

Q. I'm asking generally where did the information come from for Item No. 3.

MS. DUNSMORE: You can answer that question.

THE WITNESS: From Mr. Rick Herpel. He explained to me that I didn't have that authority.

BY MR. BART:

Q. He is not an attorney, is he?

A. No, sir.

Q. Do you know how he knew that you had no authority?

A. I figured with his position there at a GS 13, he's been in the government and he knows policies and procedures. I took his word for it.

Q. Did he say you had no authority or did he say you shouldn't be entering into contracts like this?

A. Sir, Mr. Herpel -- can't be verbatim on it -- informed me that the contracting officer has the authority for any type of government contracts, and as

an intern, and even as anybody in the government, you don't have the rights to bind the government in a contract, only a contracting officer.

Q. Did he tell you who the contracting officer was?

A. No, sir.

Q. Do you know of any room reservations signed by -- when room reservations are made such as the block we saw before for the Columbus conference -- that was a block of rooms that you were assigned to, correct?

A. I had one room in that assignment, yes.

Q. Someone had made that reservation for you, correct?

A. Yes, sir.

Q. Do you know if that particular reservation was signed by the contracting officer?

A. No, sir.

Q. Have you ever gotten any document from a person purporting to be

the contracting officer regarding this or any other matter?
A. No, sir.
Q. Looking back at your declaration, are you aware of the provisions of Job Series 1910 under the federal personnel system?
A. Yes, sir.
Q. What is that job series?
A. Quality assurance, it spells out your details as quality assurance evaluating parts, designs, everything that pertains to the job. It's all written technical for your job, what's required of you on your job.
Q. It's fair to say it doesn't say one way or the other -- it talks about the technical provisions of your job, but it doesn't say one way or the other whether you should or shouldn't be making travel reservations for your group, correct?
A. That is correct.
Q. Have you ever met

Mr. Bianchini, Gian Bianchini?
A. Yes, sir.
Q. Who is he?
A. He is -- I'm not too sure of his official title, but I know he does a lot of the training coordination for different classrooms that we utilize on DSC.
Q. Did you ever speak to him when you were making the reservations for either of the meetings that you did the block reservations for?
A. No, sir. I didn't know him at that time, who he was.
Q. Was he in that position at the time of these events?
A. I honestly do not know, sir.
Q. He is at Richmond, correct?
A. Yes, sir.
Q. You don't recall seeing him prior to this time, though?
A. Sir, I've seen him different times when we had a lot of different training classrooms on the center. Some

of the classes we had right there locally in Richmond.

Q. I'm trying to just get it down temporally, when you first met him or knew of his position. Was it subsequent to these events?

A. I really never knew Gian's complete position, sir.

Q. Did you know whether he had anything to do with arranging the classrooms or conference room facilities or the audiovisual or other materials needed for these conferences?

A. No, sir. The only thing I knew, he just took care of the rooms we had, like, in the one building there on the center, open them up or make sure stuff worked in the rooms we had.

Q. You're talking the conference rooms, not hotel rooms, correct?

A. That's correct, just local rooms on the center.

Q. You don't know when he first started doing that job?

A. I have no idea, sir.
MR. BART: I have no further questions.
MS. DUNSMORE: I have one.
BY MS. DUNSMORE:
Q. Please turn to the documents that are marked Rutkowski-5 and also Rutkowski-7. Turning to Rutkowski-7, the pages GOV-1, 2, and 3, the subject is re TDY trip May 14th to Philadelphia.
MR. BART: Which one are we looking at right now?
MS. DUNSMORE: GOV-7, Pages 1 --
MR. BART: You mean R-7?
MS. DUNSMORE: R-7, GOV-1, 2, and 3.
MR. BART: What are you referring to, TDY, to the first re?
MS. DUNSMORE: To the subject of the first --
MR. BART: The first one on the first page.
BY MS. DUNSMORE:

Q. Could you review those e-mails and clarify -- it wasn't clear to me whether it refers to the trip that is at issue in this litigation or the first trip where the rooms were booked at the Valley Forge Hilton. I was a little confused.

A. This is the first trip.

Q. Which hotel? That's the trip where you had been staying at the Valley Forge Hilton?

A. Yes.

Q. To make sure we're clear, the last four pages, GOV-4, 5, 6, and 7, which trip did that refer to?

A. GOV-4 refers to the Valley Forge. It's spelled out right there. GOV-5 refers to the second trip, same thing for six and seven.

MS. DUNSMORE: That's all I have.

MR. BART: Just one follow-up.

BY MR. BART:

Q. I think I asked this, but Ms. Latker, in that first one, referring to the one in Valley Forge, never told you that you shouldn't be making block reservations, did she?

A. No, sir.

MR. BART: I have no further questions.

\- - -

(Witness excused.)

\- - -

(Deposition concluded at 11:43 a.m.)

\- - -

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_____________________________

BETH A. BARKOCY, CCR

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying court reporter.)

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign and date the errata sheet.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate as submitted and may be used in court.

\- - - - - - -

E R R A T A

\- - - - - - -

| PAGE | LINE | CHANGE |
|---|---|---|
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |
| ______ | ______ | ________________________ |

ACKNOWLEDGMENT OF DEPONENT

I, ______________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

____________________________
Date

____________________________
Signature

Subscribed and sworn to before me this
day of , 200 .
My commission expires:

Notary Public