# EXHIBIT "C"

UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

STOUT ROAD :
ASSOCIATES, INC. t/a :
HILTON PHILADELPHIA :
CITY AVENUE :
v. :
DEFENSE SUPPLY CENTER:
RICHMOND a/k/a DLA :
(Defense Logistics : NO. 07-145C
Agency) RICHMOND : (Judge Wheeler)

ORIGINAL

\- - -

Friday, October 12, 2007

\- - -

Oral deposition of LILIBETH B. de los SANTOS, taken pursuant to notice, was held at the offices of UNITED STATES DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION BRANCH, CIVIL DIVISION, 1100 L Street NW, 12th Floor, Washington, DC, commencing at 12:02 p.m., on the above date, before Beth A. Barkocy, Certified Court Reporter and Notary Public.

\- - -

MAGNA LEGAL SERVICES
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 910
Philadelphia, PA 19102

APPEARANCES:

WILENTZ, GOLDMAN, AND SPITZER
BY: JONATHAN BART, ESQUIRE
Two Penn Center
Suite 910
Philadelphia, Pennsylvania 19102
(215) 925-1105
Representing the Plaintiff

UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
CIVIL DIVISION
BY: CARRIE DUNSMORE, ESQUIRE
1100 L Street NW
12th Floor
Washington, DC 20005
(202) 305-7576
Representing the Defendant

DEFENSE SUPPLY CENTER RICHMOND
DSCR-G
BY: DONALD M. YENOVKIAN, II, ESQUIRE
8000 Jefferson Davis Highway
Richmond, Virginia 23297
(804) 279-5538
Representing the Defendant

- - -

I N D E X

- - -

Testimony of: LILIBETH B. de los SANTOS

By Mr. Bart.................... 5

By Ms. Dunsmore............. 46

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| DS-1 | Declaration of Ms. de los Santos | 10 |

\- - -

DEPOSITION SUPPORT INDEX

\- - -

Direction to Witness Not to Answer

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Request for Production of Documents

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Stipulations

| Page | Line | Page | Line |
|---|---|---|---|
| 5 | 1 | | |

Questions Marked

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

(It is hereby stipulated and agreed by and among counsel for the respective parties that the sealing, certification, and filing are waived and that all objections, except as to the form of the question, be reserved until the time of trial.)

- - -

LILIBETH B. de los SANTOS,

having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. BART:

Q. Ms. de los Santos, my name is Jonathan Bart; I'm with Wilentz, Goldman, and Spitzer, the attorney for Hilton City Avenue. Have you ever had your deposition taken before?

A. Yes.

Q. On what matter?

A. With the US Army Corps of Engineers.

Q. How long ago was that?
A. Long time ago.
Q. Do you recall what we do at a deposition? I'm going to ask you a series of questions to which you need to listen and give a verbal response, no head shakes or uh-huhs because the reporter can't pick that up. Do you understand?
A. I do.
Q. If at any point you don't understand a question, please ask me to rephrase it and I'll be happy to do that. If you need a break, let me know and we'll take a break. If you need to consult with counsel, let me know and you can do that as well. Do you understand?
A. I do.
Q. By whom are you employed currently?
A. Defense Supply Center Richmond.
Q. What is your position?
A. Presently?

Q. Yes.
A. Presently, I am now the mechanical engineering position.
Q. Do you have an official title?
A. Mechanical engineering.
Q. Mechanical engineering?
A. Right, that's my title.
Q. Just mechanical engineering?
A. Yes.
Q. As of April of 2006, what was your title?
A. Quality assurance supervisor.
Q. Is it fair to say you were the supervisor of Donna Rutkowski in April of 2006?
A. I do.
Q. Do you have an understanding of what this litigation is about?
A. I do.
Q. What is your understanding of what this lawsuit is about?
A. I guess it's more like fact-finding things and about what

happened.

Q. What is your understanding of why Hilton City Avenue is suing DLA Richmond?

A. I think it's something like dispute or something on what had happened.

Q. And what happened?

A. The issue whether dealing with the cancellation of the reservation.

Q. Had you asked Donna Rutkowski to make a block reservation of rooms for a meeting that was to take place in Philadelphia?

A. I don't recall.

Q. If she testified that you had asked her to do so, would you say she was wrong or you just don't recall what happened?

A. Like I said, I don't recall.

Q. You don't recall asking her to make reservations for the intern group in Philadelphia for a -- let's take a look at the specific exhibit.

I'm showing you a document which was marked R-5 at Ms. Rutkowski's deposition (indicating). Have you seen this document before?

A. I do.

Q. You're familiar with the schedule that was given to the interns in quality assurance?

A. I do.

Q. Ms. Rutkowski testified that you told her to make reservations for both of the meetings which were to occur in Philadelphia, one on May 15th through the 19th and the other on July 10th through the 21st. Does that in any way refresh your memory that you asked her to make those reservations?

A. Like I said, I don't recall. 2000 -- it's been a long time, so...

Q. Do you believe that Ms. Rutkowski would have just made reservations on her own for a group?

A. I cannot answer that question.

MR. BART: Let's mark this (indicating.)

(Exhibit DS-1 was marked for identification.)

BY MR. BART:

Q. Is this your declaration that you submitted in this litigation?

A. I do.

Q. Meaning yes, correct?

A. Yes; yes.

Q. First of all, in Paragraph No. 3 you state you have no authority to enter into contracts on behalf of the government; do you see that?

A. Yes.

Q. You didn't draft that sentence, did you?

A. (No response.)

Q. Did you know as of April of 2006 whether you had authority to enter into contracts on behalf of the government?

A. I don't have authority.

Q. I'm asking you back in 2006

when these reservations were made did you know that you did not have authority?

A. Yes, I don't have authority. I'm in quality assurance.

Q. When did you learn that you didn't have authority?

A. From the very beginning. Quality assurance never have authority.

Q. If Ms. Rutkowski's testimony is correct that you asked her to make reservations on behalf of the group for two meetings, why would you have asked her if you didn't have authority to do it?

A. Like I said, I don't recall I asked her, and as a quality assurance, we don't have a binding agreement. Quality assurance is just quality assurance. We look at specifications and terms from technical aspects. We don't have a warrant to bind the government.

Q. How do you know that; who told you that you don't?

A. That's part of our job. I

don't have a warrant. I don't have -- a contracting officer is the only one who can give warrant.

Q. When did you learn of that?

A. When did I learn that?

Q. Yes.

A. From the very beginning I work for the government.

Q. How long has that been?

A. 1986.

Q. You were the supervisor of Ms. Rutkowski and all the other interns, correct?

A. Yes.

Q. Take a look at your declaration that you have in front of you. Take a look at Paragraph No. 4 where you say you were aware in late April that one of the QA specialist interns under my charge, Ms. Donna Rutkowski, had reserved 15 rooms at the Hilton City Avenue hotel. Do you see that?

A. Yes.

Q. If she didn't have authority to enter into contracts for the government, how come you didn't do anything in April of 2006 when your declaration says you knew about it?

A. It is always a policy when you make reservations, you can cancel prior to the date. That's any hotel that the government --

Q. There are nonrefundable reservations, aren't there?

A. I cannot answer that question, but...

Q. Have you ever made a reservation at a hotel which was nonrefundable?

A. I have made a reservation where I can cancel.

Q. Have you ever made -- are you aware there are reservations which either have cancellation fees or which you can't cancel at all?

A. I have no awareness of that.

Q. You have no awareness of

that. She was authorized to make the reservation for the group, correct?

A. (No response.)

Q. You learned she had made reservations for 15 people. She was authorized to make the reservation, correct?

A. (No response.)

Q. If the reservation had not had a cancellation fee, would she have been authorized?

A. I don't understand your question.

Q. You said that she was not authorized because of the cancellation fee. Did I correctly hear you say that?

A. I did not say that.

Q. When I asked you why when you found out according to your declaration that she had made these reservations you didn't do anything about it, you said it was because of the cancellation fee.

A. I don't really understand your point.

Q. You don't have to understand my point; you have to answer the question.

A. Okay.

Q. The question is why, if she was not authorized to make reservations, you didn't do anything about it in April of 2006 when your declaration says you found out about it. These reservations weren't canceled until mid-June.

A. Normally the interns are responsible for themselves. That is always.

Q. What it says is you are aware that she made reservations not just for herself but for 14 other people. Was she authorized to do that?

A. No.

Q. Then why didn't you do anything about it when you were aware in late April of 2006?

A. Why I did not do anything about it?

Q. Right.

A. There's a difference between being aware, and like I said, the interns are responsible for themselves.

Q. Ms. Rutkowski testified that you asked her to make reservations not just once but twice for the entire group, once for a May meeting at the Valley Forge Hilton and another one for a July meeting in the Hilton City Avenue. Do you recall those two meetings that were supposed to occur? We looked at the schedule.

A. By looking at the schedule, they were scheduled. As far as like you're saying -- like, I don't recall.

Q. You acknowledge that you knew in April that she had made the reservation for 15 rooms, so if you're saying she wasn't authorized to make that reservation -- is that what you're saying?

A. (No response.)

Q. Are you saying she wasn't authorized to make the reservation for 15

rooms?

A. You can make a reservation. There's a difference just saying, like, block this 15 rooms, and they're supposed to individually call for official, just like when you making a symposium, you block certain rooms and individual person provided their own individual credit cards.

Q. Maybe so, but was she authorized to make the reservation for 15 people, a block of rooms for each of those two meetings?

A. You have to be more specific by authorize.

Q. Take a look at what we marked as R-7. Take a look at that document (indicating). Take a look at each one of these e-mails. Make sure I'm not crazy and that you are copied on each one of them. For right now, limit your review to the first four pages, GOV-1 through 4. I'll get to the others afterwards.

You were copied on all of

those e-mails, correct?
A. Yes.
Q. Take a look at the second page. On April 24th Ms. Rutkowski sent an e-mail to Napoleon Walker, who was in Ohio at that time, correct?
A. Yes.
Q. He was a supervisor?
A. Yes, for the QA.
Q. It says good morning, Mr. Walker, Lilibeth wanted me to make a block room reservation for Philadelphia trip. Do you see that?
A. Yes.
Q. You never sent back to her an e-mail saying no, I don't want you to make a block reservation or you don't have authority to make a block reservation, correct?
A. What I have told the intern, like I said, they are responsible for taking care of themselves.
Q. Okay, but here you have Ms. Rutkowski telling your supervisor,

one of your senior supervisors, that you wanted her to make a block room reservation for the Philadelphia trip, correct; that's what it says? That's all I'm asking. That's what it says, correct?

A. The block of room, the reason the block of room -- like I said, I don't recall I have directed her but the purpose of the block of room, because they share cars. That's the purpose of that.

Q. Okay, but you didn't say back to her I don't want you to -- you didn't send any response to this saying that that's incorrect, I didn't instruct you to reserve a block of rooms, did you?

A. I always tell the intern that they are responsible for themselves.

Q. You see it on paper (indicating). This would appear to be a violation of what you claimed is the policy. If they are responsible for themselves, she is saying --

A. That's why --

Q. Let me finish the question and then you can answer.

She is saying in an e-mail to a senior supervisor that you had wanted her to make block room reservations for the Philadelphia trip, and you didn't respond, did you?

A. But if you look at Page 1, Ms. Pam Latker said I would recommend you make individual reservations.

Q. She recommended that she make individual reservations, right?

A. Right.

Q. That has nothing to do with what you had asked her, did it?

A. Like I said, I have told the intern they are responsible for themselves, and in concurrence with -- Ms. Pam Latker was indicating that you make your individual reservations. Each intern have their own --

Q. That's your interpretation. Did you ever speak to Ms. Latker about

this?

A. About what?

Q. About this e-mail (indicating).

A. No, we always talk to the intern on the orientation.

Q. The way I read this is she is telling Ms. Rutkowski to make individual reservations rather than all in her name but that she is making the reservations. She doesn't say in here don't make reservations for anybody but yourself, does she?

A. Yes, individual means make herself, correct.

Q. How do you know that? You're reading her mind, aren't you?

A. We always tell that to the intern on the orientation, they are responsible for themselves.

Q. Is there anything in writing that says that, any document which tells the interns that they're not supposed to make reservations for anyone but

themselves?

A. That's what we were told.

Q. If that's what you were told and that's what you told them, why were you not reacting strongly to Ms. Rutkowski's e-mail to your senior supervisor saying you wanted her to make a block reservation?

A. Like I repeat again, you know, I have told them -- that includes Ms. Rutkowski -- they are responsible for themselves.

Q. Okay, take a look at GOV-4. Here is a letter -- an e-mail to you subsequent to the prior one where she is saying Lilibeth, I have made block 15 rooms with my credit card to the Valley Forge Hilton and provided them with all 15 names. You didn't tell her you're not supposed to be doing that, did you?

A. I don't recall.

Q. That was to you.

A. In fact, I recall -- I think I have told the intern that they

individually give their credit card.

Q. Here it is, an e-mail to you where she is telling you that she had blocked 15 rooms with her credit card, and there is no response from you saying that's not what you're supposed to be doing, is there?

A. It may not be in an e-mail, but I have met with the interns and told them they have to individually call.

Q. Then in your declaration you say that you were aware she had reserved 15 rooms at the City Avenue hotel for another conference?

A. Yes, I'm aware; I'm aware of it.

Q. Where is the record of you saying that she is not supposed to be doing this? Her testimony was you asked her to do it.

A. I can't answer that question.

Q. Isn't it a fact that you believed that it was okay for her to make the reservations but the problem is that

there was a cancellation fee, correct?
A. I was not aware of the cancellation fee.
Q. That's the problem. Had there not been a cancellation fee, you wouldn't have had a problem with her making the reservation, would you?
A. That's the reason why we ask the intern. Even if myself, I make a reservation on my own, I make sure I know the cancellation fee so I will not be charged.
Q. Your answer is yes to my question?
MS. DUNSMORE: I think that's a mischaracterization of her answer.
BY MR. BART:
Q. Try to listen to the question I'm asking and then answer the question. I was basically asking you a yes or no question.
The question was there would have been no problem with her making the reservation had there been no

cancellation fee, correct?

A. Can you restate your question?

Q. I said there would have been no problem with her making the reservation for 15 people had there been no cancellation fee, would there?

A. Like I said, you can make a reservation --

Q. She can make a reservation?

A. I'm sorry?

Q. The question I asked is was there any problem with what she did to make a block reservation giving the 15 names had there not been a cancellation fee.

A. Again, I'm going to say it again, you know, I have told the interns that they are responsible for themselves. I was aware of the reservation that she did.

Q. Two of them; two block reservations, she made. One apparently had a cancellation fee; the other one did