# EXHIBIT "D"

UNITED STATES COURT FEDERAL CLAIMS

- - -

STOUT ROAD ASSOCIATES, INC. T/a HILTON PHILADELPHIA CITY AVENUE, : NO. 07-145C

v.

DEFENSE SUPPLY CENTER RICHMOND a/k/a DLA (Defense Logistics Agency) RICHMOND.

COPY

- - -

October 23, 2007

- - -

Oral deposition of PAMELA LATKER taken pursuant to notice, was held at the law office of WILENTZ, GOLDMAN & SPITZER, 2 Penn Center, Suite 910, beginning at 1:00 on the above date, before Kathleen Ruccolo, Professional Shorthand Reporter for the Commonwealth of Pennsylvania.

MAGNA LEGAL SERVICES
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 910
Philadelphia, PA 19102
Phone (866) 624-6221

A P P E A R A N C E S:

WILENTZ, GOLDMAN & SPITZER
BY: JON BART, ESQUIRE
Two Penn Center, Suite 910
Philadelphia, Pennsylvania 19102
Counsel for the Plaintiff

US DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: CARRIE A. DUNSMORE, ESQUIRE
1100 L Street, NW
Washington, DC 20530
Counsel for the Defendant

A L S O P R E S E N T:

DONALD YENOVKIAN, II

# I N D E X


| WITNESS | PAGE |
|---|---|
| PAMELA LATKER | |
| By: Mr. Bart | 4 |


- - -

## E X H I B I T S


| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Latker-1 | GOV-1 through GOV-7 | 14 |
| Latker-2 | GOV-362 | 40 |


(Exhibit Latker-2 retanied by counsel.)

(By agreement of counsel, the signing, sealing, filing and certification of the transcript has been waived; and all objections, except as to the form of the question, have been reserved until the time of trial.)

PAMELA LATKER, after having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BART:

Q. Ms. Latker, I apologize for the somewhat difficult circumstances of doing a deposition by telephone, but I hope you bear with me. My name is Jon Bart. I'm the attorney for plaintiff, Stout Road Associates, trading Hilton.

You understand you are here pursuant to a Notice of Deposition under Rule 30B6 of the Federal Rules of Civil Procedure as the defendant Defendants Supply Center Richmond's designee?

A. Yes.

Q. And have you had an opportunity to review the Notice of Deposition and the various categories of testimony with which you have been designated to testify?

A. Yes.
Q. Okay. Can you pull out that notice, please?
A. I have it in front of me.
Q. All right. First of all, can you state your -- who do you work for?
A. I work for the Defense Logistics Agency, the DLA Training Center, Columbus, Ohio.
Q. And what relation does DLA Richmond have to this entity?
A. DLA Richmond is one of our agencies under the Defense Logistics Agency, but they play a role when it comes to the intern program. We have interns at the DLA sites.
Q. What is your specific title?
A. Career Programs Branch Chief for the DTWC.
Q. Okay. Do you know who Gian Bianchini is?
A. Yes, he actually works for DTC.
Q. His testimony was you were in overall charge of the intern program in Columbus, Ohio; is that correct?
A. Yes.

Q. All right. And in that capacity are you familiar, looking at the Notice of Deposition, with all policies and procedures with respect to scheduling of training of events for interns?

A. Yes.

Q. All right. Are you familiar with the specific meeting which the Hilton Philadelphia City Avenue rooms were booked?

A. Yes, the training.

Q. Okay. And have you reviewed any documents in preparation -- in your preparation for this deposition relating to those two areas of inquiry?

A. Yes.

Q. All right. What have you reviewed?

A. I just reviewed the documents that were sent by Donald.

Q. This morning, you mean?

A. Yes.

Q. Okay. And are those the documents which I provided to your counsel this morning?

MR. YENOVKIAN: This is Mr. Yenovkian. Are you looking for a representation of what she looked at?

MR. BART: Correct.

MR. YENOVKIAN: She has. We have in front of us all of the discovery that was produced by the government to the plaintiff, and she has looked through much of that, and she also has the Notice of Deposition, the contract, whatever the things are that you identified as documents we should have readily available for the deposition.

MR. BART: All right.

BY MR. BART:

Q. Let's start with that first area. Are there any policies and procedures of your organization with respect to the scheduling of training events?

A. Well, if you are looking internally, the way that we schedule -- we are looking just at the interns, correct?

Q. Correct.

A. Okay. What we work with on the intern scheduling is that we internally come together and look at what our needs are going to be based on what we think our intern numbers will be for the year. We are intern cycles twice a year. We have interns

coming on in February, and also in July, and our schedules are actually put together between the June time frame to August time frame from the previous year. So, we look at where we think we are going to have interns, and we have to look at the various career programs, and then we place the training events where it is going to be most cost-effective.

Q. I'm probably asking a more general question, but before I get to that you used the term we repeatedly in this answer. Can you define who we is, in addition to yourself?

A. That would be our Career Program Administrators. I have Career Program Administrators assigned for each career program we have responsibilities for.

Q. I believe there were three of them, am I correct?

A. Program administrators?

Q. No. Three career intern programs, or am I mistaken on my terminology?

A. No. We have ten career programs and we have various activities.

Q. All right. So, who -- first of all, Donna Rutkowski, do you know who she is?

A. Corporate intern underneath us.
Q. Okay. And corporate intern refers to what?
A. DLA Training Center has the responsibility for all DLA corporate interns at all the activities. We do centralized recruitment and hiring. Then they are under our umbrella for two years.
Q. And she was an intern, though, in a specific area, was she not?
A. Yes, she is an intern in Richmond in Quality Assurance.
Q. And what other interns were at Richmond in addition to Quality Assurance, what other areas?
A. We have contracting. We have supplies, which is broken into different career building cells, and that would have been all at that time.
Q. Okay. And when I said three before, because those are the three that were identified at the prior depositions.
A. That is what you meant, the three in Richmond?

Q. Right.
A. Okay.
Q. And were there any other locations in which the interns in Quality Assurance, Contracting and Supply were located during this time period?
A. We have -- yes, we have interns at all of our -- we have interns scattered throughout the DLA sites. Yes, we have contracting, supply and quality at other supply centers in DLA, as well as demos.
Q. My understanding from the prior depositions is that the training of the quality assurance contracting and supply personnel in Richmond was coordinating with two other areas; is that correct? With trainees in two other areas, meaning, I believe, Ohio and Philadelphia; is that correct?
A. I don't know if it was coordinated or not. It depends on the training event, how many interns we would have scheduled to attend the training event.
Q. The meeting that was scheduled to take place in Philadelphia that is the subject of this litigation, are you familiar with that?
A. Yes.

Q. Why don't you tell me what that training session was scheduled to be?

A. It was a statistical quality control class. It was a class scheduled to be held at on DSEP grounds. We had a training facility setup at our organization, and the Richmond interns were scheduled to go out to Philly, because originally we had Philly interns also attending that training.

Q. All right. And were there any procedures in effect for the scheduling of rooms -- of travel by these interns that were coming up from Richmond?

A. The ones coming up from Richmond had not received any formal guidance yet, other than the training schedule, and they knew that was scheduled in July, but the guidance normally is that they would make individual reservations. Normally they would do their own reservations for the hotel, but they would be carpooling together.

Q. But there is nothing in writing or any other policy that had been communicated to them prior to the time of this meeting?

A. Not yet, no, because it would have been too soon.

Q. Okay. At what time were the policies -- first of all, what policies were there with respect to the travel of these interns that were going to be, but had not yet been, presented to the interns?

A. Well, the policies basically would be, we would give them reporting instructions that they would have a training scheduled. They would know when they were traveling. We would tell them what days were supposed to be for travel and when they would be departing. This is a two-week course. We would have given them that guidance, but we would not have specified what hotel arrangements to make, other than they needed to be carpooling. We would tell them how many cars they would have, and it would be up to the interns in that group to make their hotel arrangements.

Q. Okay. Take a look at the documents marked GOV 1 through GOV 7, and let me know when you have them.

MR. YENOVKIAN: Mr. Bart, this is Don Yenovkian.

MR. BART: Yes.

MR. YENOVKIAN: Do you want to mark that as anything?

MR. BART: It was already marked as Rutkowski-7. I am content to remark it, if you like, as Latker-1.

MR. YENOVKIAN: Whatever your preference is. Just note for the record I believe we noticed during the Rutkowski deposition that GOV 8 was a continuation of GOV 7. Do you remember that or not? Did you want GOV 8 attached, is my question?

MR. BART: Give me a second. I'll go get it, because I just pulled the exact and it is not on the exhibit. Let me -- give me about 30 seconds, I'll get it.

MS. DUNSMORE: The other thing is, Mr. Bart, if you remember the first page -- pardon me. If you remember, the first pages of this e-mail string refer to one trip, the May 14th trip, page one, two and three. Then the later pages refer to the trip that is the subject of this litigation, just to keep that clear.

MR. BART: Okay. GOV 8 is -- I mean, GOV 8 is already marked as Rutkowski-6. So, it need not be in this group. It really

doesn't matter. I'm looking at it. It is on the same e-mail. The thing is, of course, these are all strings, so you get different e-mails on different pages.

MS. DUNSMORE: I don't have it on GOV 6.

MR. BART: Rutkowski 6.

MS. DUNSMORE: Pardon me. I just wanted to make sure that was clear.

MR. BART: GOV 45 is the --

MS. DUNSMORE: Document.

MR. BART: Exactly.

BY MR. BART:

Q. All right. Do you have those documents, Ms. Latker?

MR. YENOVKIAN: We have in front of the witness GOV 1 through GOV 7.

MR. BART: Okay. I'll have it stamped as Latker-1.

(At this time a document was marked for identification as Exhibit No. Latker-1.)

BY MR. BART:

Q. Have you seen any or all of these e-mails, Ms. Latker, previously?

A. GOV 1, yes, obviously. I didn't see the one with GOV 4.

Q. Okay. So, you've seen GOV 1 through 3, but not GOV 4 through 7?

A. I'm not -- well, let me say on GOV 1, I saw that one. I'm not even sure if I saw the rest from the GOV 3. GOV 4 I was not on at all. And, no, I hadn't seen GOV -- well, the GOV 5 through 7 were the conversations between, I think, Lilibeth or between Jaret and Donna. I had not seen those.

Q. All right. Looking at this you don't recall whether Ms. Rutkowski attached her e-mail to Napoleon Walker when she forwarded to you the request about his out-of-office reply?

A. No, I don't recall this, but it's on here, but I don't recall it. It was so long ago, no. Obviously I'm on here that he got the out-of-office. I do remember page one.

Q. Now, does DLA or the acronym you used, DTC?

A. Yes.

Q. I'll use DTC so we are consistent. Have any written policies with respect to corporate travel -- I shouldn't say corporate travel -- with

respect to the hotel reservations of its interns?

A. The hotel reservations of interns would need to be on -- they're expected to call into the hotel and reserve their own room with their own personal government credit card.

Q. And is there a written policy that states that with respect to hotel reservations when there are educational or training sessions that is what they are supposed to do?

A. That should have been covered under -- they have the DTS training, and we also have credit card training that they take online. Also, they get it in their DTA training, which is defense travel.

Q. All right. Is there anything that you can point to in terms of a written policy that specifically deals with the necessity of making individual reservations for hotels?

A. I can't specifically point to anything other than the rules on the government credit card that says it is for your own personal travel for government, not to be used for anything else but your own personal travel.

Q. Okay. Does that mean that -- wouldn't that mean that that particular rule or policy

applies only to the use of credit cards, and not to the making of reservations?

A. True. You could make a reservation for a group, but you can't reserve it with your own government credit card other than your own room.

Q. Okay. Now, if you turn to GOV 2, you see where Ms. Rutkowski said that Lilibeth De Los Santos wanted her to make a block-room reservation for the Philadelphia trip for the interns, correct?

A. Yes, that is what it says.

Q. Okay. And given what you just said about making reservations, there was nothing wrong with Ms. Rutkowski making a reservation for the group, was there?

A. No, as long as -- no, as long as she didn't sign a contract, and it was just a group reservation where they would call in with their personal government credit cards.

Q. Where is the policy that says that she cannot sign a contract?

A. She can't sign a contract because she doesn't have a government purchase card, which is a little bit different.

Q. Let me ask you this, who in DTC has a

government purchase card?
A. A person that has been delegated from the contracting office to have a purchase card.
Q. And who is that?
A. There is different -- we have all different ones, for example Gian has one, Gian Bianchini. Our training folks have them to purchase training with. My assistant has one to do supplies and also to purchase training materials.
Q. Okay. When Ms. Rutkowski made reservations for the group, which you said she could do, wasn't she subjecting the group to whatever terms and regulations were involved in that reservations?
A. Normally, when you do a group reservation you just call the hotel, and when you talk to whoever you are scheduling the reservations with you say, I need ten -- if it is a block of rooms you say I need ten rooms, and give them the information, and then the people would call in following with their credit card information.
Q. Okay. So, in this particular instance Ms. Rutkowski apparently gave all 15 individual names. Do you see that?
A. Which page is that on?

Q. It's GOV 4.

A. GOV 4, yes.

Q. Okay. I have made block 15 rooms with my credit card to the Valley Forge Hilton and provided them with all 15 names. Each intern is to use their own card when they check in. Do you understand that?

A. Uh-huh.

Q. You can't say uh-huh, on the phone in particular. Did you mean yes?

A. Yes, I see that.

Q. Now, was that consistent with DTC policy?

A. This, yes, it would be, as long as she didn't sign anything. It says here she made a block of rooms and they are to call in with their credit cards.

Q. Now, when she used her credit card what was it your understanding she was using her credit card for?

A. To reserve her own room.

Q. Well, as I read that e-mail it appears that she blocked the 15 rooms with her credit cards, correct? With her credit card, correct?

A. Right.
Q. Now each, individual person was to pay with their own credit card when they showed up, but the reservation was made with hers alone, correct?
A. Yes, sounds like she blocked the rooms.
Q. My question to you was -- -
MR. YENOVKIAN: She was still answering, sir.
THE WITNESS: It doesn't say it was being charged, it was just being blocked.
BY MR. BART:
Q. My question to you is, what is your understanding of what she was doing with her credit card when she blocked 15 rooms?
A. Normally -- you know, I've never seen anything like this before. Normally, what we will do is call in for 15 rooms and block it, and just reserve our own with our credit card. I don't know what that means. It says that it is blocked. I blocked 15 rooms with my credit card. To me that doesn't mean it is charged to it. They are holding it.
Q. That is correct. I would agree. She made the reservations and used her credit card to hold

the reservations, correct?
A. That is what it sounds like.
Q. Now, if there were a -- I think we got testimony from Mr. Bianchini last time that the government subjects itself to the cancellation policies of the hotel. Would you agree with that?
A. For room reservations, yes.
Q. All right. So, if Ms. Rutkowski had reserved 15 rooms with her own credit card, and the hotel required 24-hour advance notice of a cancelation, and the instructor became ill the day of the meeting, and the rooms were canceled, would that not mean that there would have been a charge of 15 rooms to Ms. Rutkowski's credit card?
A. I don't know. I don't know if there would be for those 15 rooms or just for her own.
Q. All right. But there is nothing that violates DTC policy for her to reserve 15 rooms for the group, was there?
A. Not -- no. As long as she is not signing anything to go with it.
Q. And where in DTC policy is there any provision as to signing or not signing of an agreement, that someone has the authority to make a

reservations but not to sign something?

A. Well, you can't sign something with your own credit card that is a personal government credit card that would be charged to your card for other people. That is against the government credit card rules.

Q. That is not what I'm asking you. I am asking you where in DTC policies is there any written indication that, while Ms. Rutkowski had authority to make reservations, she didn't have the authority to sign anything?

A. Say that one more time.

Q. I said, where is it to be found in DTC policies, their written policies, that while Ms. Rutkowski may have had the authority to make reservations for the group, she had no authority to sign anything?

A. She is not going to see that from DTC. She would see that from, again, other training that she has taken through DTC or government credit card online training.

Q. But at the time of this meeting she had not seen any of that, had she?

A. She should have already been through

DTS training, if she came to orientation. We give that prior to them coming on the road.

Q. Excuse me just one second. I'm reading to you Ms. Rutkowski's deposition at page 23 from a week ago Friday. I asked her in terms of what she had made before, what reservations had she made before, and she said that she had made reservations at Homewood Suites in Philadelphia and -- I'm sorry, she said that, and although we ended up realizing it was the Valley Forge. I'll just read you what she said. Prior to the instances with the intern center, which is the one that is involved at the Hilton City Avenue, she had made rooms -- reservations with the Homewood Suites in Philadelphia for the same group for a training session that was going to be held in May for one week. Class got canceled. Called the hotel and canceled the reservations straight out.

Question: At that point you believed that you were authorized to make these reservations.

Yes, sir.

Question: And similarly authorized to cancel them, correct?

Answer: Yes, sir.

Question: You didn't just go off and

decide to make the reservations on your own, did you?
Someone asked you to do that, correct?

Answer: Yes, sir.

Question: Who was that person.

Answer: Lilibeth De Los Santos De.

Question: Is that correct for both the ones at the Homewood Suites earlier, and the ones at the Hilton City Avenue?

Answer: Yes, sir.

Now, it's apparent, is it not, that neither Ms. Rutkowski, nor her supervisor, Ms. De Los Santos, believed that there was any limitation on their authority to make and cancel reservations?

A. Agreed.

Q. All right. Now, when they were making reservations they were making it on behalf -- well, for the purpose of a DTC training event, were they not?

A. Yes.

Q. Okay. Similarly, Mr. Bianchini regularly makes reservations for training sessions for classrooms, audio visual and/or materials that are necessary, correct?

A. Yes.

Q. All right. And these events are coordinated, are they not? I mean, when they reserve a classroom and they reserve hotel rooms, it is coordinated to a schedule that is provided to all of the trainees, correct?

A. Yes. Normally we don't have -- we usually don't have both going on, hotel rooms and a facility scheduled. Normally we do as much as we can on base.

Q. Right. But there are events, as we saw in the prior depositions, which occur, say in Philadelphia or Ohio, and if the Richmond and Philadelphia people are going to attend they'll need hotel rooms?

A. Yes, if they travel.

Q. All right. So, to get back to my question that started this, is there any written policy that states that while these people are authorized to make hotel reservations for the group for DTC functions they are not to sign anything?

A. No, that I'm aware of. But, again, we don't recommend group reservations.

Q. And if you look back at GOV 1 on what the exhibit that we pulled out before, Latker-1.

A. Yes.

Q. That is what you are saying in your response to Ms. Rutkowski, correct?

A. They make individual reservations for the hotel, right.

Q. But you didn't say it is against policy to make a block reservation, did you?

A. No, but -- no, I didn't say to make a block reservation.

Q. At any time subsequent to this particular reservation, and the claim for a cancellation fee, did you issue any directive to the trainees that announced a policy as far as signing documents?

A. We do some discussions at orientation, but, again, it would depend on -- again, each career program administrator discusses individually their own sessions with their interns. We discuss travel in general. So, it may have been mentioned in an individual session. I don't know.

Q. You are not familiar with any written directives or e-mails, other communications dealing with this particular event? In other words, the signing of a written contract for a reservation block?

A. No, we've never had any of that.

Q. Okay. Getting back to the Notice of Deposition. Did you look for or review any documents relating to the specific meeting for which the Philadelphia City Avenue rooms were booked?

A. Did I look for? I was aware of the situation. I was aware of the situation because I'm over the interns.

Q. Right. And I mean there was -- all right, I'll ask it this way, because, remember, you are here as the designee for DTC to testify about the documents and the policies.

A. Yes.

Q. Okay. So, what did you look at and what documents exist with respect to the DTC intern training session or educational session in Philadelphia for which the Hilton rooms were booked?

A. I have the schedule, obviously, that our career Program Administrators give out to their interns, and I have documentation that the session was not canceled, but it was moved, and I am the one that requested that that be moved.

Q. Okay. And why did that occur?

A. That occurred because we ended up not

having any Philadelphia interns in the session, and to be cost-effective we are not going to hold a session in Philadelphia when all the attendees are in Richmond. We moved the class to Richmond.

Q. And why did it take two months to determine that there were no Philadelphia interns?

A. We have Philadelphia interns that are scheduled at some of the other classes. So, in some cases our interns will get into the local offerings of the classes at a different time or different date, and they may have filled those classes up. So, we will go back and check our roster frequently, and as I go through the database if I see that the numbers are changing we'll look at the cost benefit of where we want to have the training. So, I will go in and do an analysis of the training, what is happening. As for -- we found that we had Philadelphia interns moved out, and that it was just the Richmond attending.

Q. Did you see any other documents regarding that session?

A. No, just the roster of the interns. No other information. Just the information from the instructor saying that they are moving it.

Q. Okay.

A. That was it.

Q. Did you look at any other documents regarding arrangements for training sessions or educational sessions for the intern group during that year? I think that was 2006.

A. This group, no. No. I looked at their classes to see which -- you know, whether it would be beneficial for any of these classes to be in Richmond or whether in Philadelphia, and I did a pool of all --

Q. Take a look at request number four. All documents and communications summarizing the scheduling of all conference, meetings and training sessions by DLA Richmond at hotels, conference centers or restaurants within one year of 2006. Did you personally --

MS. DUNSMORE: Which one are you referring to?

MR. BART: Number four. Number four.

MS. DUNSMORE: Well, that's actually -- again, this the same problem we had before. I think you are looking at the document request, the designees are page three, the topics which we designated --

MR. BART: I'm asking about the documents right now.

MS. DUNSMORE: I'm sorry. I misunderstood.

MR. BART: Yes.

THE WITNESS: No.

BY MR. BART:

Q. Do you know who did?

A. No.

Q. All right. If you look at page three of the Deposition Notice.

A. Yes.

Q. It was a request for a person to testify about the delegation of authority within DLA Richmond for the scheduling of conferences, meetings, planning and training sessions. Do you see that?

A. You said number three?

Q. Page three, number one.

A. Number one. I'm sorry. Yes.

Q. My question to you is, who would be able to answer the question I asked you just previously, which is, who would know of the documents and communications relating to the scheduling of conference, meetings and training sessions at hotels,