# EXHIBIT "E"

UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

STOUT ROAD :
ASSOCIATES, INC. t/a :
HILTON PHILADELPHIA :
CITY AVENUE :
v. :
DEFENSE SUPPLY CENTER:
RICHMOND a/k/a DLA :
(Defense Logistics : NO. 07-145C
Agency) RICHMOND : (Judge Wheeler)

ORIGINAL

\- - -

Friday, October 12, 2007

\- - -

Oral deposition of GIAN BIANCHINI, taken pursuant to notice, was held at the offices of UNITED STATES DEPARTMENT OF JUSTICE, COMMERCIAL LITIGATION BRANCH, CIVIL DIVISION, 1100 L Street NW, 12th Floor, Washington, DC, commencing at 9:25 a.m., on the above date, before Beth A. Barkocy, Certified Court Reporter and Notary Public.

\- - -

MAGNA LEGAL SERVICES
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 910
Philadelphia, PA 19102

APPEARANCES:

WILENTZ, GOLDMAN, AND SPITZER
BY: JONATHAN BART, ESQUIRE
Two Penn Center
Suite 910
Philadelphia, Pennsylvania 19102
(215) 925-1105
Representing the Plaintiff

UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
CIVIL DIVISION
BY: CARRIE DUNSMORE, ESQUIRE
1100 L Street NW
12th Floor
Washington, DC 20005
(202) 305-7576
Representing the Defendant

DEFENSE SUPPLY CENTER RICHMOND
DSCR-G
BY: DONALD M. YENOVKIAN, II, ESQUIRE
8000 Jefferson Davis Highway
Richmond, Virginia 23297
(804) 279-5538
Representing the Defendant

\- - -

I N D E X

\- - -

Testimony of: GIAN BIANCHINI

By Mr. Bart.................. 5

\- - -

E X H I B I T S

\- - -



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Bianchini-1 | Notice of Deposition | 7 |
| Bianchini-2 | GOV-760 | 14 |
| Bianchini-3 | GOV-761 | 14 |
| Bianchini-4 | GOV-565 through GOV-572 | 38 |

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Request for Production of Documents

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Stipulations

| Page | Line | Page | Line |
|---|---|---|---|
| 5 | 1 | | |

Questions Marked

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

(It is hereby stipulated and agreed by and among counsel for the respective parties that the sealing, certification, and filing are waived and that all objections, except as to the form of the question, be reserved until the time of trial.)

- - -

GIAN BIANCHINI, having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. BART:

Q. Can you state your name for the record, please.

A. Gian Bianchini.

Q. Mr. Bianchini, my name is Jonathan Bart; I'm with the law firm of Wilentz, Goldman, and Spitzer. I'm the attorney for the plaintiff, Stout Road Associates trading as Hilton Philadelphia City Avenue. Let me start by asking have

you ever had your deposition taken before?

A. No.

Q. Let me give you a few instructions and/or directions. I'm going to be asking you a series of questions to which you are to give a verbal response. You understand that the reporter cannot pick up a nod of the head or an uh-huh and that you have to answer verbally; do you understand that?

A. Yes.

Q. If you don't understand a particular question, feel free to ask me to restate the question so that you can understand it properly. While I don't want you to guess at answers, you are to answer to the best of your knowledge, information, and belief. Do you understand that?

A. Yes.

Q. You are here today being presented as a designated witness on behalf of the United States. In this

case, DLA Richmond is the particular defendant. Do you understand that you've been designated to testify as to certain issues?

A. Yes.

Q. Have you looked at the notice of deposition which stated the issues to which you are designated to respond?

A. Yes.

Q. I'm going to show you -- I think we only have one copy here right now, so we'll mark it later.

MR. BART: Do you have your own copy?

MS. DUNSMORE: I have the original.

MR. BART: Can you show the witness the original.

MS. DUNSMORE: (Indicating.)

MR. BART: I'll mark this as an exhibit.

(Exhibit Bianchini-1 was marked for identification.)

BY MR. BART:

Q. Let me show you the one we've marked and just confirm for the record that that's identical to the one you were looking at (indicating). Look at the first page.

A. It's identical.

Q. Let's go through the various topics and state whether you are familiar with each of these topics and feel comfortable testifying as the designee of DLA Richmond. Number one is all policies and procedures of DLA Richmond with respect to the scheduling of events such as training in Philadelphia for interns which had been scheduled by DLA Richmond in April 2006 for Philadelphia in June 2006.

MS. DUNSMORE: I have to object. That's actually the list of documents.

MR. BART: Am I looking at the wrong thing?

MS. DUNSMORE: It should be Page 3.

MR. BART: I'm sorry; my mistake. Strike that.

BY MR. BART:

Q. Item No. 1, the delegation of authority within DLA Richmond for the scheduling of conferences, meetings, planning, and training sessions, first of all, are you familiar with the procedures within DLA Richmond on the delegation of authority for scheduling conferences, meetings, planning, and training sessions?

A. Yes.

Q. What have you done in preparation for this deposition, what documents have you reviewed and what other material might you have consulted to familiarize yourself with this topic?

A. Met with the lawyer, provided e-mails concerning from June 2005 to June 2006, any type of training sessions that I booked for Richmond Defense Supply Center.

Q. Did you look at any polices

or procedures stated in any format all?
A. No.
Q. You are employed by whom?
A. I'm employed by DLA Training Center in Ohio but I am housed at Defense Supply Center Richmond.
Q. What is your title?
A. I am a human resources specialist.
Q. What are your responsibilities and duties?
A. My responsibilities are to schedule the interns for training courses. I also take care of all the nongovernment courses on the installation.
Q. When you say that you scheduled training courses, you are referring now to the actual setting up of the classroom facilities and the scheduling of the instructors?
A. Correct.
Q. Is there anything else you do?

A. No.
Q. Do you know the term contract officer?
A. Yes, I do know the term.
Q. Are you a contract officer?
A. No.
Q. On those occasions when you schedule training sessions, are you -- let me strike that.
MS. DUNSMORE: Mr. Bart, I'm sorry; we didn't put the stipulations regarding objections on the record. I'm sorry to interrupt, but I don't want to forget about it.
MR. BART: Let's step back for a second. We want to enter into what we in Philadelphia would call the usual stipulations, which is that all objections are reserved to the time of trial and are not waived by not bringing them -- are you familiar?
THE COURT REPORTER: Yes.
MR. BART: Anything you want

to state?

MS. DUNSMORE: We have a prepared thing that we read.

MR. BART: Go ahead.

MS. DUNSMORE: It's that the parties agree that all objections including those to the form of the question and other objections that might have been obviated or removed during the course of the deposition are preserved and not waived by the failure to make them before or during the deposition not withstanding the provisions of Rule 32(d) that would apply in the absence of the stipulation.

Thank you.

MR. BART: I assume you want to preserve your right to read and sign the deposition.

MS. DUNSMORE: Correct. Thank you.

BY MR. BART:

Q. When you schedule training

sessions, that includes making reservations with hotels and the like for conference rooms and other facilities?

A. Only conference rooms for training sessions.

Q. When you schedule a reservation for a conference room, what precisely do you do?

A. I normally call the hotel and ask them if they have the dates available for what I'm looking for.

Actually, let me take a step back. I first check if we have any type of rooms on the installation first. I try to do that. Depending on what exactly the customer needs, if they need computers, if they don't need computers, we'll try to book them on site. If there's no available space on site, then we go and try to book them to the hotel.

When I book to the hotel, I call the hotel, the sales manager, and tell him the dates I need. If it's available, they fax me over a contract

for me to sign and I'll go ahead and sign it, fax it back.

Q. Let me show you a document.

MR. BART: Let's mark this as Bianchini-2.

(Exhibit Bianchini-2 was marked for identification.)

MR. BART: And three, respectively.

(Exhibit Bianchini-3 was marked for identification.)

BY MR. BART:

Q. I am showing you documents which have been Bates stamped as GOV-760 and GOV-761 (indicating). Are these documents which contain your signature?

A. Yes, they are.

Q. Is this a form you customarily use when you make a reservation for classroom facilities?

A. No, this is a form I use to basically just make payment of the classroom.

Q. I notice that it states

what's referred to as standard government procedure. Do you see that?

A. Yes, I do.

Q. Is this a document you drafted?

A. It was drafted by the folks in our office, the HR office.

Q. Do you know specifically who gave this form to you for your use?

A. No, I don't.

Q. It states that it is standard government procedure not to pay for service until it is received; is that correct?

A. Correct.

Q. It goes on to say that late cancellation fees will be paid if required by your stated policy; do you see that?

A. Yes, I do.

Q. That is standard for the government, it will pay late cancellation fees if required by the hotel's policy?

A. Yes, it is.

Q. This document was sent to Homewood Chester, correct? Do you see the fax markings at the top?

A. Yes.

Q. Homewood Chester is that Homewood Suites?

A. Yes, Homewood Suites hotel.

Q. Which I believe is a Hilton brand, correct?

A. Correct.

Q. Chester is Chester, Virginia?

A. Yes.

Q. Just looking at these two registration forms, do you know what class you were making reservations for?

A. Yes, under services rendered, it says room rental for market research statement of work course.

Q. For B2?

A. Correct. And the other one is for briefing techniques.

Q. And these are different conferences that were being held?

A. Correct.

Q. Were there hotel rooms that were also reserved for these two meetings?

A. I don't know.

Q. Who would know -- first of all, do you know the policy with respect to the reservation of hotel rooms for the meetings at which you are reserving classroom space?

A. No.

Q. Do you know if there are any differences in the policies for reserving hotel rooms than for reserving classroom space?

A. I don't know the policy. That would definitely be something that Pam Latker can shed more light on.

Q. Who is Pam Latker?

A. Pam Latker is the overall in charge of the intern program in Columbus, Ohio.

Q. Is she a contract officer?

A. I don't know.

Q. Do you know who is the

contract officer who would have responsibility for the contracts of the intern program?

A. No.

Q. To your knowledge, have you ever spoken with any such person?

A. No.

Q. Let's go back to what we marked as Exhibit B-1, which is the notice of deposition. In terms of the directions given to Donna Rutkowski to organize and schedule -- and/or schedule a training session in Philadelphia for interns in June of 2006, do you have any knowledge, personal knowledge, of the directions that were given to Ms. Rutkowski?

A. No.

Q. Do you know what her authority was for scheduling or reserving a block of hotel rooms?

A. No.

Q. Do you know who would?

A. No.

Q. Do you know who was responsible for scheduling the training session itself? Did you have any role in that?

A. No.

Q. Not even for classrooms?

A. No, because this training session is in Philadelphia. I don't deal with Philadelphia; I deal strictly with Richmond.

Q. I assume then that the same will be true as your answer to Item No. 3, what the agenda was for the planned internal meeting in Philadelphia, you would not know?

A. I would not know, no.

Q. Four is the chain of authority within DLA Richmond with respect to the planning of meetings, conferences, and training sessions generally and the line of authority between the contracting officer and Mr. Herpel, Ms. Santos, and any other personnel with a role in the planning and

ultimate cancellation of the training session. I think you already said you don't know who the contract officer is, correct?

A. I don't know.

Q. Do you know anything about the chain of authority within DLA Richmond with respect to the planning of meetings, conferences, and training sessions generally?

A. As far as DLA Richmond goes, for the conference rooms, training rooms, it would be me but --

Q. When I'm asking the chain of authority, I accept the fact that you have authority to make those reservations. Who do you report to; who is your immediate supervisor?

A. My immediate supervisor is Arinda Lee, and she works out of Ohio.

Q. That's the same office as Pam Latker?

A. Same building, but they're separate. Pam Latker is in the intern

center, and Arinda would be in the work force development center.

Q. So how would a meeting be coordinated with respect to an intern training session that requires the kinds of facilities for which you are responsible?

A. The first thing they do is they come up with a schedule for the year.

Q. Who is they?

A. The career program administrators, CPAs. They're in Ohio.

Q. Career --

A. Program administrators.

Q. Are they with either the intern center or work force development?

A. They are with the intern center. They are responsible for the interns during their two-year course of the internship.

Q. So what do they do?

A. They get the schedule together depending on what function the

interns are in. There's quality tech, supply, and procurement. Once they get the schedule together, they'll send me the schedule and then I'll go and try to find classroom space depending on what their needs are. Like I said before, if we can put them on site and save money, we'll do that. If not, then we'll go ahead and put them off site.

Q. Do you have a particular contact from the career program administrators who you normally deal with when they put together a program and then contact you and say we need these facilities?

A. There are several of them. For quality tech, it's Kim Morgan.

Q. Kim?

A. Kim Morgan. I would get my guidance from her.

Q. Supply?

A. Carla Jones.

Q. And procurement?

A. Sam Walls.

Q. Is that W-a-l-l-s?
A. W-a-l-l-s.
Q. How does Ms. Lee figure in this chain or is she just generally responsible for supervising you? Does she get any of these communications or do they come directly to you?
A. Directly to me.
Q. Let's go on then. They put together a schedule, they then contact you. Is that generally by e-mail these days?
A. Yes, generally by e-mail.
Q. And what happens next? They tell you what they need, correct?
A. Correct. After they tell me what they need, I'll go ahead and try to book a classroom for them. Once I do book the classroom, I'll send an e-mail back, let them know they're booked either on site or off site and provide them with the hotel information.
Q. And they are responsible for making their own hotel reservations?

A. I don't know.
Q. Who, to your knowledge, has provided you with the authority to make these hotel reservations for classrooms and conference rooms?
A. The delegation of authority that I have comes from Arinda Lee.
Q. In what form is that authority, written or oral?
A. It's in a letter that we get.
Q. Do you know what the letter says?
A. Not off the top of my head, no. I can't read it off verbatim.
Q. To the best of your ability, what does that letter say?
A. I don't recall, really.
Q. When did you get this letter, or do you get it periodically?
A. I believe we get it every time we have a new supervisor, so this could have been maybe about a year ago.
Q. Are you in possession of this letter?

A. No.
Q. I don't mean today.
A. Yes, it's in my office.
MR. BART: I'd like --
MS. DUNSMORE: We provided it to you. I can pull it up for you.
MR. BART: If you have the Bates number.
MR. YENOVKIAN: It's upstairs.
MR. BART: So the letter has been produced?
MS. DUNSMORE: Yes.
BY MR. BART:
Q. As far as you know, it's from Arinda Lee?
A. It states Arinda Lee, but it's from the support services from the base who provide us with our credit cards, our government cards. They provide us with the letter stating -- it has Arinda Lee's name on it. We sign it and then provide a copy back to the base support folks.

Q. Is this then -- what you're describing as your authority is basically the same letter that goes to everybody who uses a government credit card?

A. No, because a government credit card is completely different than a travel card. My sole purpose of having a government card is to purchase training. Other government cards are for travel.

Q. What is the distinction between a card for training and a card for travel?

A. Just that, one is for training and one is for travel; two different pots of money.

Q. But the card itself, if you tried to use a government card for training that -- yours is for training, you said, correct?

A. Correct.

Q. If you tried to use it for travel, somebody who received your card would not know that, would they?

A. The card does state it's for travel purposes.

Q. Your card?

A. No, the other card. So it's strictly for travel. They should be able to distinguish that it's just for travel.

Q. I'm asking your card, though, a training card. If you used it to reserve -- you're using it to reserve conference rooms at the Homewood Chester, for example, correct?

A. Yes.

Q. That's the card you used in the exhibit we saw?

A. Yes.

Q. If you would also ask them to reserve some hotel rooms, would the card have been valid for that purpose?

A. I don't know. I don't know; I don't know.

Q. Do you know who Nathaniel Walker is?

A. Napoleon Walker?

Q. Sorry, Napoleon Walker?

A. Yes.

Q. Who is he?

A. He is the career program administrator.

Q. Career what?

A. Program administrator, CPA.

Q. What is his business relationship with Ms. Latker in the chain of authority?

A. (No response.)

Q. He is with the intern program?

A. Yes, he is with the intern program.

Q. Is he Ms. Latker's superior or is she his supervisor?

A. She is his supervisor.

Q. Is she then the overall head of the intern program?

A. Yes.

Q. Are you familiar with any limitations on her authority?

A. Not familiar with her limitations at all; I don't know.

Q. Is it fair to say you're not really familiar with the authority she has either?

A. Fair to say that. I don't know her job function, complete function.

Q. I also would presume, and correct me if I'm wrong, that you don't know if she is a contract officer?

A. I don't know.

Q. Looking back at what we said is Item No. 1, the delegation of authority within DLA Richmond for the scheduling of conferences, meetings, planning, and training sessions, are you familiar with the chain of authority for anything other than what you do specifically, reserving rooms, conference rooms and meeting facilities?

A. I don't understand the question.

Q. Are you familiar with the process by which -- I guess I'll ask more generally about the intern program since it's not just at DLA Richmond, correct?